THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
SEYMOUR SCHLAGER, Defendant-Appellant.

Second District   No. 2—92—0027

Opinion filed August 2, 1993.

Sherman C. Magidson and John L. Sullivan, both of Magidson & Sullivan, Beigel & Sandler, and Allan A. Ackerman, of Law Offices of Allan A. Ackerman, P.C., all of Chicago (Thomas A. Decker, of counsel), for appellant.

Michael J. Waller, State's Attorney, of Waukegan (William L. Browers and Martin P. Moltz, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE McLAREN delivered the opinion of the court:

Defendant, Seymour Schlager, was found guilty by a jury of the attempted murder of his wife. (Ill. Rev. Stat. 1989, ch. 38, pars. 8—4(a), 9—1(a).) The circuit court of Lake County sentenced defendant to 13 years' incarceration. On appeal, defendant argues for reversal because (1) the evidence was insufficient to support a conviction and (2) he received ineffective assistance of counsel requiring a new trial. We affirm.

On February 12, 1991, defendant returned home from his work as a medical director at Abbott Laboratories. After greeting his wife, Diane, he went to their bedroom in order to take a nap. At 7 p.m., Diane woke him for dinner. Their teenage children, Jason and Carin, had already eaten dinner, so defendant and his wife ate alone. Defendant told his children to go to bed at 10 p.m. After watching the news, he and Diane retired to the master bedroom and Diane took a shower. Defendant also took a shower and then began to pace from the bedroom to the bathroom. Diane asked defendant why he was pacing, and defendant responded that he was nervous, that she should not pay any attention to it, and that she should go to sleep. Later in the evening, Diane awoke because defendant had been getting in and out of the bed. She testified that she heard a "crackling noise and a crinkling" and that she noticed a pillow which was covered with plastic lying on the floor on defendant's side of the bed. Diane asked defendant what the pillow was intended for. Defendant responded, "You don't want to know."

Defendant then left the room and Diane fell back to sleep. When she awoke, defendant was no longer in the room. Diane found defendant in the living room and asked defendant if anything was wrong. Defendant told her to go back to bed. Defendant returned to the bed-

room, lay down in the bed and began to cry, and stated that he was depressed. Diane suggested that they call a psychiatrist or a hospital. Defendant responded that he could handle it himself and that he did not want anybody to help him. Defendant proceeded to climb on top of Diane, holding her down with his weight, and continued crying and saying that he was having a nervous breakdown. Diane agreed and again suggested that they get someone to help him. Diane continued to console him after he rolled off of her, but defendant told her not to touch him. Diane dozed and awoke again sometime after 4 a.m. to see defendant sitting on his edge of the bed. At this time, defendant reached down for the plastic-covered pillow on the floor, jumped onto Diane, who had been lying on her back, and forced the pillow over her face.

Diane struggled and managed to turn onto her stomach. Defendant continued pushing her face down into the mattress, reached around her head, and clamped her nose shut with his fingers. Diane testified that the struggle lasted between three and four minutes before defendant fell off her, knocking a lamp to the floor. Diane began to scream to her children to call 911. Defendant stated "What am I doing? What am I doing? You're my wife. I love you."

Diane ran past defendant into the foyer and attempted to open the front door in order to trigger the household security system which would call the police. Defendant had followed Diane into the foyer and pushed the proper code on the alarm in order to deactivate it. Defendant repeatedly stated, "Don't call, don't call." Diane ordered defendant out of the house, but he refused. Diane then obtained a knife from the kitchen and directed defendant to be seated in the family room, until the police arrived.

At interviews conducted after his arrest, defendant stated that he had been under stress for the past several months and had not slept for more than 30 to 45 minutes in the past two days. He indicated that he intended to use the plastic bag on himself in order to commit suicide. His written statement indicates that his attempt to suffocate his wife with the pillow was brought on by a violent recurring dream he had been having in which he was being attacked by a number of people.

The arresting officer testified that he asked defendant to relate what had occurred. Defendant responded that he had experienced a violent dream and that he woke up standing in the kitchen facing his screaming wife. Another officer testified that defendant stated, "I have ruined my life, I can't believe I tried to kill my wife. I tried to

kill my wife." Defendant gave the following written statement to the police:

> "I have been under tremendous emotional stress for the past two to three months—this has become accentuated in the past 48 hours during which I have not slept more than 30-45 min. Last night was another sleepless night. I was very depressed and stayed up most of the night talking about my depression with my wife. She was extremely supportive [and] loving, offering several solutions to help me. During the night, I contemplated suicide [and] told my wife about this. I was not thinking clearly [and] even attempted to harm myself by burying my face in a pillow lined with plastic—I also told my wife about this. Finally, at around 4:15 A. M., I dozed off and dreamt a recurring dream I have had over the past week—a dream wherein I am being choked and pulled by several people none of whom I recognize. I awoke in fear, anger [and] panic [and] threw the pillow lying on my side of the bed onto my wife. We struggled for 10-15 seconds [and] her screams [and] the fact that we rolled off the bed stopped my efforts. This was a spur of the moment effort to harm my wife with no realization on my part as to why—my efforts were directed against my wife but were brought on by sleepless exhaustion. My aggression would have been exerted toward anyone lying next to me. My attempts to suffocate the person next to me were brought on by my sleepless state [and] the dream I had just had. I am deeply sorry for the actions I took which could have caused my wife's death, and I am fully willing to seek professional help for my psychological problems."

At trial, defense counsel's opening statement attempted to put defendant's actions in the context of a lifetime of studious, hardworking, and nonviolent behavior. The opening statement attempted to illustrate how certain stresses accumulated during the months prior to the incident which, taken together, established that defendant did not intend to take his wife's life. Among these stresses, defense counsel listed an affair defendant had undertaken with a 24-year-old co-worker named Melinda. Defense counsel explained that defendant was having difficulties terminating his relationship with Melinda and that he handled the affair in a "foolish" manner. Defense counsel explained that the extramarital affair caused defendant great emotional trauma, which put him in a state of exhaustion.

In addition, defense counsel explained that defendant had been experiencing great stresses at his job at Abbott Laboratories. Defense

counsel also explained that defendant's health had been deteriorating, that he had become hypertensive, and that he began taking a drug for his condition. This drug, Calan, allegedly caused defendant to experience sleep disfunctions and violent dreams. Defense counsel argued that the accumulation of these various stresses caused defendant to suffer a nervous breakdown on the night of the murder attempt. As a result, defendant obtained a plastic dry cleaner's bag from the closet and attempted to kill himself with it. Defense counsel then argued that defendant, in response to a violent dream and without conscious intent, found himself trying to kill his wife by placing a pillow over her face. After a lamp crashed to the floor, defendant began to realize what he had been doing, awoke, and did not attempt to harm her further. Defense counsel also told the jury that it would hear from an expert who would testify that defendant's violent dreams were related to his ingestion of Calan. Thus, defense counsel presented the theory that, taken in this context, defendant could not be said to have consciously and intentionally attempted to take his wife's life.

The prosecution submitted as evidence a tape recording that defendant sent to his children sometime after the incident. The prosecution sought to admit a portion of the tape which reflected, in defendant's own words, the nature of his relationship with Melinda in order to show motive.

Defense counsel at trial argued against the admission of this tape because of its personal nature, its minimal relevance and its prejudicial impact. Defense counsel explained that the fact of the affair had been stipulated and evidence of the same should not be unnecessarily accentuated during trial. The trial court allowed the tape into evidence because it demonstrated the nature of defendant's relationship with Melinda. In the alternative, defense counsel argued that, if the tape were to be presented to the jury, it should not be limited to the particular sections identified by the State. Thus, defense counsel suggested that the entire tape should be played.

In the tape defendant addresses Jason and Carin. It is apparent from the contents of the tape that defendant is responding to a letter he received from Jason. This letter is an expression of Jason's anger, concerns, fear, and doubts towards and about defendant. In the tape, defendant attempts to address all of these issues. The duration of the tape is approximately 45 minutes. Defendant expresses a variety of emotions throughout the tape.

Defendant initially addresses Jason's financial concerns. Defendant then discusses his present and future job prospects in light of his felony charge. Defendant's comments then turn toward the topic of

his relationship with Melinda. Defendant attempts to provide an explanation for his activities with her in relation to his dedication to his wife, Diane. Defendant describes, at some length, the reasons he became involved with Melinda, his negative feelings towards her, Melinda's desire to become engaged, and the fears he experienced as a result of the danger the relationship posed to his professional status.

Defendant also describes at some length the methods he used to extract himself from his relationship with Melinda. First, he explains that he gave her one of Diane's rings. Defendant asserts that this allowed Melinda to tell co-workers that she was engaged to someone other than defendant. Defendant also fabricated a story and informed Melinda that his wife suffered from Hodgkin's disease thus preventing him from ending his marriage. In the tape, defendant also unequivocally denied having admitted to committing the crime and denied having ever entertained a thought to harm his wife.

At the end of the prosecution's case, counsel for defendant motioned for a directed finding on the ground that the State failed to prove beyond a reasonable doubt that defendant consciously intended to kill his wife. The trial court denied the motion determining that a reasonable trier of fact, based upon the evidence, could return a verdict as to the charge. Defense counsel then indicated that the defense rested. The State rested, and proofs were closed. After discussing proposed jury instructions, the following exchange took place:

"THE COURT: Mr. Schlager, I want to put something on the record and I'm not directing this to Mr. Schlager. Mr. Gillespie, it was indicated to me at the conclusion of evidence that's been borne that you were going to have a conference with your client in terms of how to proceed in the case, is that correct?

MR. GILLESPIE: That's correct, your Honor. We did spend a great deal of time and preparation for this trial with the possibility of Mr. Schlager testifying. That was our plan. We listened to the prosecution's case. When they rested, we then discussed over two hours I think you gave us for lunch yesterday, whether or not we were going to proceed or put the prosecution to their proof and we decided that—Mr. Schlager was actively involved in that decision making process—that we would rest our case and put the prosecution to its proof.

THE COURT: He hasn't indicated any dissatisfaction with that decision, is that correct?

MR. GILLESPIE: Not that I know of. Are you satisfied, sir?

MR. SCHLAGER: No, no, I'm not dissatisfied."

Following defendant's conviction, defendant filed a motion for a judgment notwithstanding the verdict on the ground that he was not proved guilty beyond a reasonable doubt or, in the alternative, for a new trial due to ineffective assistance of counsel. The trial court subsequently conducted hearings on these matters.

Defendant proceeded to present a series of psychologists, mental health experts, and pharmaceutical experts, in order to illustrate his innocence and point out trial counsel's failure to establish a proper defense by failing to adequately investigate these experts and call them at trial. In essence, this defense sought to establish that defense counsel failed to properly investigate and put forth the defense regarding the effects of Calan and the impact of confusional arousal on defendant's actions during the night of the crime.

According to one expert (Dr. Berenbaum), confusional arousal is a specific kind of sleep disorder in which the person, awakened from deep sleep as a result of a violent dream, will become disoriented and harm himself or those around him in response to the dream. Berenbaum indicated that confusional arousal was closely related to another sleep disorder called night terrors or sleep terrors. These terrors involve violent dreams on the part of an individual who, upon awakening, believes he is still threatened and thrashes out or performs a violent act in response. Berenbaum expressed the opinion that defendant suffered from these problems. According to Berenbaum, a person suffering from these disorders is functioning without complete consciousness and would have only a fragmentary memory of the acts he perpetrated and would wonder why he committed those acts. Berenbaum expressed the opinion that defendant was experiencing a state of confusional arousal on the night in question and could not form the intent to kill his wife.

Other experts defendant called at his post-trial hearing testified that defendant's confusional arousal, as well as his depression, insomnia, and exhaustion, could have been exacerbated by an abrupt withdrawal of Calan ingestion. Defendant allegedly had been taking the drug for hypertension prior to the crime. Defendant's use of the drug was not prescribed. Defendant took the drug on his own and claimed he had access to the drug through samples he had received.

In ruling that defendant was not denied the effective assistance of counsel, the trial court was of the opinion that the scientific principles asserted by witnesses pertaining to the Calan defense were not solid and were subject to substantial questions regarding weight and validity. The court noted that the proposed experts lacked a reasonable scientific basis for arriving at their opinions. Moreover, the court ques-

tioned the evidence's weight and credibility because defendant had prescribed the medicine for himself, acquired it without prescription, and did not document the nature, time and extent of its use. Additionally, in the absence of defendant's testimony at trial, the trial court attributed little weight to the confusional arousal defense. Thus, the trial court determined that the failure to present these defenses did not render defense counsel ineffective and did not render the verdict unjust.

The trial court also discussed defendant's decision not to testify and asserted that trial counsel was not ineffective for failing to put defendant on the stand. The trial court highlighted, in this regard, the many avenues in which defendant's testimony could be challenged and discredited in terms of his propensity for telling the truth. In the trial court's opinion, defense counsel's performance fell within "not only a wide range of reasonable, professional assistance, but within a wide range of high [*sic*] reasonable, professional assistance." In this regard, the trial court highlighted the manner in which defense counsel conducted his pretrial motions, his opening statement, his cross-examination of witnesses, his decision to seek out lesser included offense instructions, and the quality of his closing arguments.

In the trial court's opinion, defense counsel's decision to conduct the trial somewhat differently from his opening statement amounted to a strategic decision in which defendant participated and concurred. Therefore, the trial court denied defendant's motion for judgment *n.o.v.* and defendant's motion for a new trial.

Defendant first argues that the evidence was insufficient to support the verdict of attempted first degree murder. The general rule is that a criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. (*People v. Collins* (1985), 106 Ill. 2d 237, 261.) *Collins* indicates that the question on review is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*Collins*, 106 Ill. 2d at 261, citing *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789.) *Collins* further dictates that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution. (*Collins*, 106 Ill. 2d at 261, citing *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789.) We cannot overturn a guilty verdict unless the proof is so unsatisfactory and unconvincing that it raises a serious doubt of defendant's guilt in light of all the evidence. (*People v. Bennett* (1991), 222 Ill. App. 3d 188.) Viewing the present case in the context of these

principles, we conclude that there is sufficient evidence to support the jury's verdict. In the light most favorable to the prosecution, we are not convinced that there is a serious doubt of defendant's guilt.

A person commits the offense of attempted murder when, with intent to commit murder, he does any act which constitutes a substantial step towards the commission of murder. (Ill. Rev. Stat. 1989, ch. 38, pars. 8—4(a), 9—1(a).) Thus, a defendant must have intended to commit a murder and must have completed an act which constituted a substantial step towards that end. In the present case, both of these conditions were met. The substantial steps defendant took towards the commission of murder, along with his immediate appreciation of the criminality of his acts following the failed attempt, provide sufficient evidence of defendant's intent to support the verdict below.

■■ Viewing the evidence in the light most favorable to the prosecution, defendant came to bed that evening prepared to commit the crime. He obtained the plastic dry cleaner's bag from a closet, placed it over a pillow on the floor next to the bed, and waited for his wife to fall asleep before forcing it upon her face. Defendant's efforts persisted even in light of his wife's struggles, and he sought to manually restrict her airflow by reaching around and pinching her nose shut after she had successfully avoided being smothered by the pillow by rolling over. A jury could view these acts as substantial steps toward the commission of murder and as evidence of an individual's intent to commit murder. Although defendant argued that his actions were in response to a violent dream he had been experiencing, a jury could reasonably infer that one does not come prepared to meet attackers in a dream by taking a plastic-covered pillow to bed.

In our view, a rational trier of fact could determine that an individual responding to attackers in a dream would not be so quick to recognize the criminality and consequences of his acts which he perpetrated while he was unconscious. For example, after it was apparent that defendant's acts to quietly suffocate his wife had failed, defendant immediately attempted to exonerate himself. As Diane began to scream, defendant stated, "What am I doing? What am I doing? You're my wife. I love you." In addition, as Diane attempted to trigger a security alarm which would notify the police, defendant, aware of his guilt, deactivated the mechanism. Thus, a rational trier of fact could determine that defendant acted consciously and intentionally at all times before, during and after the murder attempt. Moreover, defendant tendered conflicting statements to the police regarding the point at which defendant awoke from the violent dream, thus making his story less credible.

A jury could also reject the proposition that defendant obtained the plastic dry cleaner's bag with the intention of using it upon himself to commit suicide. Defendant's explanation of how he intended to kill himself with the plastic dry cleaner's bag is highly incredulous. The oddity of choosing this method of committing suicide is greatly enhanced by the coincidence that he should use this same plastic bag and pillow, in a manner which required some dexterity, in order to fend off the attackers he encountered in his dream. It defies reason and understanding how a sleeping individual could contrive such an elaborate response, which by mere chance happens to prevent his "dream-state attackers" from screaming out for help. Therefore, we determine that a rational trier of fact could have found beyond a reasonable doubt that defendant took substantial steps towards the commission of murder with the intent to commit murder.

Defendant next argues that he requires a new trial because he was denied the effective assistance of counsel. To succeed on a claim that counsel's assistance was so defective as to require reversal of a conviction, defendant must show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. (*Strickland v. Washington* (1984), 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064; see also *People v. Chandler* (1989), 129 Ill. 2d 233, 242.) The purpose of the effective assistance guarantee of the sixth amendment is to ensure that criminal defendants receive a fair trial. *Strickland*, 466 U.S. at 683, 80 L. Ed. 2d at 690-91, 104 S. Ct. at 2062.

The *Strickland* test is a benchmark used to determine whether a defendant received a fair trial. Defendant must overcome a strong presumption of outcome reliability and show that "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686, 80 L. Ed. 2d at 692-93, 104 S. Ct. at 2064.

According to *Strickland*, "a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." (*Strickland*, 466 U.S. at 696, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.) It is the "confidence in" and "reliab[ility of]" the outcome that is in question. (*Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 697-98, 104 S. Ct. at 2068.) In making this inquiry, *Strickland* dictates that we must consider the "totality of the evidence before the judge or jury." (*Strickland*, 466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2069.) Moreover, scrutiny of a trial counsel's performance must be highly deferential, and there is a strong presumption that counsel's

conduct is within the wide range of reasonable professional assistance. (*People v. Hrobowski* (1991), 216 Ill. App. 3d 711, 724.) This deference will extend to the trial counsel's exercise of judgment, discretion, and trial strategy. *Hrobowski*, 216 Ill. App. 3d at 724.

■ Applying the standard set out in *Strickland* in the context of all the evidence before the trial court, we determine that defendant was not denied a fair trial, that his trial counsel's performance was not defective and that the findings at the trial level would not have been affected had trial counsel acted as defendant claims counsel should have.

Defendant's principal assertion in this regard is that, in opening remarks, trial counsel promised the jury that defendant and several experts would take the stand in order to establish that defendant did not intentionally attempt to murder his wife because he suffered from violent dreams brought on by exhaustion, depression, stress, and the influences of Calan and confusional arousal. Defendant asserts that defense counsel failed to fulfill his promise to the jury by resting after the prosecution had presented its case. We determine that trial counsel's decisions were a matter of trial strategy and that the proposed defense would not have altered the outcome of the case.

During the course of defense counsel's lengthy opening statement, the following statements were made:

> "Because of the stress with his work at Abbott and the side practice, his health started to deteriorate and he became hypertensive. He was diagnosed as suffering from severe hypertension as a result of the stress. And he started taking a medicine. And you're going to have to consider this medication as well when you consider that one-minute period on February 13. He was taking Calan. And you're going to hear come into this courtroom an expert who is going to come up here and talk to you about Calan and talk to you about what this drug, which is a relatively new drug on the market, talk to you about the side effects of it.
>
> The doctor is going to tell you, Dr. Ehrenpreis, one of the foremost experts in the field of pharmacology in the country, if not the world, he's going to tell you that this drug Calan causes very, very severe problems in the area of sleep, very severe sleep dysfunctions [*sic*], insomnia, violent, terrible dreams. He is going to show you documentation in the literature about these violent, terrible dreams that people can suffer as a side effect from Calan."

On appeal, defendant argues that defense counsel's failure to fulfill his promises in his opening remarks results in *per se* prejudice under *Strickland* and amounts to reversible error as a matter of law. We cannot agree with this position. Viewed as a whole, defense counsel's actions were not so serious that they deprived defendant of a fair trial.

Defendant cites *People v. Ortiz* (1922), 224 Ill. App. 3d 1065, to support his argument. In *Ortiz*, defense counsel's opening statement promised the jury that it would hear evidence intended to show that someone other than defendant committed the crime. Defense counsel failed to bring forth this evidence at trial. On appeal, the court reversed the aggravated battery conviction and found that defense counsel was ineffective. The court determined that defense counsel's failure to fulfill his promise in his opening statement created sufficient prejudice to justify the reversal. The court also noted that defense counsel lacked an understanding of fundamental rules concerning witness examination. Moreover, the court asserted that absent these errors there was a reasonable probability that the result of the trial would have been different. *Ortiz*, 224 Ill. App. 3d at 1072-73.

Thus, the test is not whether defense counsel fulfilled all the promises he made during his opening remarks but, rather, whether defense counsel's errors were so serious that, absent those errors, the result of the proceeding would likely have been different. Viewed in this manner, we do not believe that defense counsel's actions in the instant case warrant a reversal. Moreover, defense counsel in the present case did not exhibit a misunderstanding of the fundamental rules of civil procedure, nor did defense counsel fail to subject the State's witnesses to meaningful adversarial testing, nor did defense counsel's trial strategy contain flawed legal arguments. See *Ortiz*, 244 Ill. App. 3d 1065; *Chandler*, 129 Ill. 2d 233.

Indeed, following the post-trial hearing even the trial court was of the opinion that the scientific principles asserted by witnesses pertaining to the Calan defense were not solid and were subject to substantial questions of validity. The trial court also believed that there was a lack of any reasonable scientific basis for the experts arriving at their opinions. We agree, and, thus, defense counsel did not err by deciding not to present the proposed defense. Moreover, it was a valid strategy to let the evidence stand as it was presented without asking the jury to believe a theory that defendant had a

rare reaction to a self-prescribed drug whose procurement and ingestion were uncorroborated.

The mere fact that a defense existed with respect to defendant's sleep disorder does not mean that the presentation of that defense was mandated. As revealed by the evidence brought out at the post-trial hearing, valid reasons existed for trial counsel's strategic decision to alter the defense theory as the trial proceeded.

We note that, by the trial's end, defense counsel had become all too aware of defendant's credibility problem. For example, at the post-trial hearing, defense counsel stated:

> "Well, another thing that I recall was that there was a great deal of evidence that his Honor Judge Tonigan kept out in your case in chief that would come back and that he would revisit or reconsider should Mr. Schlager get on the witness stand and testify such as a false internal medicine certificate, such as false statements that he made to numerous co-workers about somebody getting killed in a car accident and that's how his nose got broken when actually he went in for a rhinoplasty, such as a false appraisal on a ring that he gave to [Melinda]. All of those items I thought, according to my understanding and recollection of His Honor's decision, he would revisit whether or not those items could be introduced or the defendant could be confronted with them concerning his truth or veracity."

In light of this credibility problem, defense counsel strategically chose defensive theories which would not require defendant's testimony. For example, according to defense counsel's testimony at the post-trial hearing, the decision was made during the course of the trial that the strategy should be one which asserts the State's failure to prove its case beyond a reasonable doubt and possibly risk a lesser-included offense rather than one which presents a defense based upon questionable facts subject to assured impeachment. Trial counsel testified that defendant agreed with this defense strategy.

Furthermore, once defendant decided not to testify, the experts' opinions lacked the proper foundation to support the conclusion that defendant experienced Calan withdrawal symptoms because evidence of defendant's ingestion of the drug was based primarily on defendant's own testimony. Defendant had no prescriptions to establish his use of the drug, and the medicine he allegedly took was obtained through drug company samples. Thus, defense counsel strategically chose to forego the Calan defense.

In addition, defense counsel strategically chose to forego the sleep disorder defense because its validity rested primarily upon the truth of defendant's own statements, and, if defendant had taken the stand to testify about his sleep disorder, he would have been subject to damaging cross-examination. The expert testimony regarding defendant's sleep disorders would also have been in jeopardy because it, too, substantially relied upon defendant's testimony or testimonial descriptions.

Defense counsel also stated that the defense in the case was to establish that defendant's actions were not intentional. This strategy was evidenced by defense counsel's cross-examination and argumentation before and after trial. Defendant was portrayed as a provider and a dedicated family man who would never intentionally harm his wife. Thus, defense counsel decided that the tape containing defendant's statements regarding his innocence was the best defense evidence available because it allowed defendant to assert his innocence without risking damaging cross-examination.

In our view, this is a valid trial strategy which was adequately presented with defendant's consent. We note that the evolution of this trial strategy was concluded at closing, when counsel explained why defendant did not take the stand and that defendant, at most, committed an assault or a battery but did not intend to commit murder.

We determine that counsel's defense was sufficient under *Strickland* and that there was no showing the verdict would have been different but for counsel's representation of defendant.

The judgment of the circuit court of Lake County is affirmed.

Affirmed.

INGLIS, P.J., and QUETSCH, J., concur.