Seymour I. SCHLAGER, Petitioner–
Appellant,

v.

Odie WASHINGTON, Respondent–
Appellee.

No. 95–2391.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 19, 1997.

Decided May 14, 1997.

Allan A. Ackerman (argued), Chicago, IL, for Petitioner–Appellant.

Michael A. Hurst (argued), Office of the Attorney General, Criminal Appeals Division, Chicago, IL, for Respondent–Appellee.

Before POSNER, Chief Judge, and ROVNER and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

As head of AIDS research at Abbott Laboratories in suburban Chicago, Dr. Seymour Schlager faced what he described in his own words as the "herculean and Solomonic task" of balancing the needs of dying AIDS patients, his employer, the FDA, and the scientific community. Unfortunately, on a cold February night 6 years ago, Dr. Schlager acted more like Henry VIII than Hercules or Solomon as he tried to smother his wife of 20 years with a pillow. It didn't work, and an Illinois jury found him guilty of attempted murder.

After the verdict came in, Schlager ditched his lawyer, hired a different one, and asked for a new trial, claiming he was denied the effective assistance of counsel. The state trial judge held a comprehensive hearing on

the matter, rejected Schlager's claim, and sentenced him to 13 years in the state pen. Schlager appealed, again alleging that his trial counsel's performance was constitutionally deficient. Relying upon the 834-page transcript generated at the postconviction hearing, the Illinois Appellate Court rejected Schlager's claim. *People v. Schlager*, 247 Ill.App.3d 921, 187 Ill.Dec. 554, 617 N.E.2d 1275 (1993). After the Illinois Supreme Court denied Schlager leave to appeal, he filed a petition for a writ of habeas corpus in federal court. The district court denied the petition and Schlager appeals.[1]

The facts of this case could form the plot of a bad made-for-TV movie. By late 1990 Schlager seemed to have it all. He and his wife, Diane, had been, again in his own words, "peacefully and faithfully" married for 19 years. They had two children and lived in a $420,000 home on a golf course in an exclusive Chicago suburb. Schlager, a former professor at Notre Dame University, was a respected M.D./Ph.D, earned a six-figure salary, drove a fancy car, and had been informed that he would be promoted to director of AIDS research at Abbott Labs in January 1991.

But things were not quite as rosy as they seemed. In September 1990 Schlager began an affair with a 24-year-old co-worker named Melinda. Melinda, Schlager explains, was "young and beautiful," and he was "flattered by her advances." Schlager and Melinda would rendezvous at her apartment (he had a key), at area hotels, and while on joint business trips. To keep the affair going, Schlager admits he "became sneaky and devious and fabricated a number of lies."

Actually, Schlager told a pack of lies, but only a handful of the real humdingers are worth mentioning at this point. For example, Schlager gave Melinda what she thought was an expensive diamond ring. He even showed her an appraisal certificate placing the ring's value at $62,000. As it turns out,

he forged the appraisal—the ring was really a $70 fake (ironically, it had been purchased a few years earlier at a store called "Imposters") taken from Diane's jewelry box. On another occasion, Diane scheduled a romantic anniversary dinner for two at Gordon's restaurant on December 29, 1990. Schlager told her to cancel the reservations because Abbott Labs was sending him to Tokyo on business. Although Schlager did ring in the new year with a trip, his destination was not the Far East. Instead, he treated Melinda to a lavish 3-day getaway at the Hotel Intercontinental in downtown Chicago. To top off the weekend, Schlager took Melinda to Gordon's-twice. After the weekend tryst, Schlager gave Diane a full account of his trip to "Tokyo," including the fact that during the long flight home he watched a movie—"Godfather III."

A few weeks after the getaway at the Hotel Intercontinental, Schlager told Melinda he could not divorce his wife because she had developed Hodgkin's disease and needed chemotherapy. By early February, however, Diane's imaginary cancer must have entered imaginary remission, as Schlager (falsely) informed Melinda that he had retained an attorney and divorce papers were in the works. Finally, in a hint of things to come, Schlager told Melinda he would have his vasectomy reversed if they decided to have children.

Such was the state of "affairs" before February 12, 1991. On that day Schlager left work early, stopped for a haircut, and arrived home at 5:15 p.m. After taking a nap and eating dinner, Schlager joined Diane and the kids in the master bedroom, where they popped a video (Tom Cruise and Nicole Kidman in "Days of Thunder"!) into the VCR. Apparently the movie wasn't too hot—Diane lost interest and decided to catch "Thirty Something" on TV in the family room. Schlager later joined her. At 10 p.m. they sent the kids to bed, watched the news, and retired to the bedroom. After Diane hit the

---

1. Schlager was represented by counsel in the district court. After his petition was denied he filed an appeal pro se. While his appeal was pending, this court, sitting en banc, determined that the new habeas provisions of the Antiterrorism and Effective Death Penalty Act of 1996 applied to pending petitions. *Lindh v. Murphy*,

96 F.3d 856 (7th Cir.1996), cert. granted in part, —— U.S. ——, 117 S.Ct. 726, 136 L.Ed.2d 643 (1997). A motions panel of this court subsequently granted leave for counsel to appear on Schlager's behalf and ordered supplemental briefing regarding *Lindh's* effect on this case.

sack, Schlager hopped into the shower. When he finished, he began pacing back and forth between the bedroom and the bathroom. When Diane asked him what was wrong he replied that he was just nervous and she should go to sleep. A short time later Diane woke up because Schlager had been getting in and out of bed. She also thought she heard "crackling" and "crinkling" noises. At that point Diane noticed that one of the bed pillows was lying on the floor, covered with plastic. When she asked what the pillow was for, Schlager told her "You don't want to know." He wasn't kidding.

Schlager then left the bedroom and Diane dozed off. A short while later she awoke and discovered her husband in the living room. She again asked what was troubling him, but he told her just to go back to bed. He followed Diane back to the bedroom, began crying, and told her he was depressed. Diane suggested they call a hospital or a psychiatrist, but Schlager refused. He then climbed on top of Diane, held her down, and stated that he thought he was having a nervous breakdown. She agreed and tried to console him, but he rolled away and told her not to touch him. Diane once again tried to get a little sleep.

She wasn't very successful. Sometime after 4 a.m., she awoke to find her husband sitting at the edge of their bed. After a moment or two Schlager reached down, grabbed the plastic-covered pillow, jumped onto his wife, and forced it over her face in an attempt to smother her. Diane fought and managed to wriggle onto her stomach, but Schlager pushed her face into the mattress and tried to pinch her nose shut with his fingers. After struggling for a few minutes, one of them kicked over a lamp. When the lamp crashed to the floor, Schlager let Diane up. As she screamed for the kids to call 911, Schlager muttered, "What am I doing? What am I doing? You're my wife. I love you." Hoping to trigger the home's burglar alarm, Diane made a break for the front door. Alas, Schlager beat her to the punch and deactivated the alarm by entering its code on a key pad in the foyer. As Schlager was yelling "Don't call, don't call,"

Diane seized a kitchen knife, held her husband at bay, and ordered him to sit on the couch until the police arrived.

After Schlager was arrested he told the police that he had been under unbearable stress at work and had not slept for more than 30 to 45 minutes in the 48 hours before the attack. He also informed the officers that he had attempted to kill himself using the plastic bag wrapped around the pillow and that the assault on his wife was triggered by a recurring dream, in which he was attacked by a large group of people.

Attorney Terence Gillespie represented Schlager at trial. In his opening statement Gillespie tried to place Schlager's behavior in the context of his demanding career and the stress of attempting to end his affair with Melinda. He told the jury that the pressures of AIDS research and leading a double life led Schlager to self-prescribe Calan SR to reduce hypertension. He explained that Schlager had easy access to free samples of the drug at work. Gillespie then told the jury:

> [Y]ou're going to hear come into this courtroom an expert who is going to come up here and talk to you about Calan and talk to you about what this drug, which is a relatively new drug on the market, talk to you about the side effects of it.

> The doctor is going to tell you, Dr. Ehrenpreis, one of the foremost experts in the field of pharmacology in the country, if not the world, he's going to tell you that this drug Calan causes very, very severe problems in the area of sleep, very severe sleep dysfunctions, insomnia, violent, terrible dreams. He is going to show you documentation in the literature about these violent, terrible dreams that people can suffer as a side effect from Calan.

> Sy [Schlager] is going to tell you, when he comes up to our case and he gets on the witness stand, he is going to tell you that he was suffering from violent, terrible dreams.

Gillespie predicted the evidence would show that unbearable stress led Schlager to suffer a nervous breakdown and that Schlager did not intentionally attempt to suffocate his wife.

The State kicked off its case-in-chief by calling Diane Schlager to the stand. She gave a chilling account of the attack and set the stage for the prosecution to introduce a pattern of lies Schlager had told her and others. After Schlager's daughter, the arresting officers, and Melinda testified, the State sought to introduce portions of an audio cassette Schlager made for his children prior to trial. Specifically, the State wanted to play an excerpt from the tape, in which Schlager discusses his affair with Melinda. When the trial court gave the State the green light, Gillespie successfully argued that the jury should also hear the rest of the tape, in which Schlager denies that he ever admitted to the crime, expresses remorse, and explains that he never intended to harm Diane. After playing the tape in full—45 minutes or so of a plea for forgiveness coupled with a denial by Schlager of any attempt to hurt Diane—the State rested.

Gillespie and Schlager felt the State had not proved intent beyond a reasonable doubt so they decided not to put on a defense. When they informed the trial judge of this strategy the following discussion took place:

THE COURT: Mr. Schlager, I want to put something on the record and I'm not directing this to Mr. Schlager. Mr. Gillespie, it was indicated to me at the conclusion of evidence that's been borne that you were going to have a conference with your client in terms of how to proceed in the case, is that correct?

MR. GILLESPIE: That's correct, your Honor. We did spend a great deal of time and preparation for this trial with the possibility of Mr. Schlager testifying. That was our plan. We listened to the prosecution's case. When they rested, we then discussed over two hours I think you gave us for lunch yesterday, whether or not we were going to proceed or put the prosecution to their proof and we decided that— Mr. Schlager was actively involved in that decision making process—that we would rest our case and put the prosecution to its proof.

THE COURT: He hasn't indicated any dissatisfaction with that decision, is that correct?

MR. GILLESPIE: Not that I know of. Are you satisfied, sir?

MR. SCHLAGER: No, no, I'm not dissatisfied.

After the jury found Schlager guilty of first degree attempted murder he hired a new lawyer and moved for judgment notwithstanding the verdict, arguing the evidence admitted at trial was insufficient to sustain a conviction. In the alternative Schlager sought a new trial, claiming he had been denied effective assistance of counsel. He alleged Gillespie's performance was constitutionally defective because he made unfulfilled promises to the jury in his opening statement and failed to investigate and present a defense based on a link between Schlager's withdrawal from Calan SR and "confusional arousal," a sleep dysfunction which could have caused him to act involuntarily in response to violent nightmares.

The state trial judge thoroughly looked into Schlager's contentions. He conducted a postconviction hearing and spent days listening to testimony from no fewer than eight witnesses. Among the witnesses were Diane and Schlager's 16–year–old daughter. They testified that 3 to 4 weeks before the attack Schlager told them he had stopped taking Calan SR. Additionally, Diane testified to a series of incidents—corroborated by Schlager's own testimony—which made clear that Schlager lied to just about everyone he ever met. For example, he lied to his wife, his children, and the police about his affair. He lied to Melinda about the ring, his wife's health, and a pending divorce in order to string out their relationship. He lied to his parents, co-workers, and potential employers about being board-certified in internal medicine; he even forged a certificate to that effect after bombing the exam. Finally, he lied to friends, relatives, and co-workers about his decision to have cosmetic surgery. After having a nose job, Schlager encountered clotting difficulties. Because his nose would not stop bleeding, he missed 3 weeks of work. Instead of owning up to the true nature of the problem, Schlager told anyone who would lend an ear that he injured his nose in a car accident. And it wasn't just any old car accident; it was a headon crash

which killed the other driver, who was drunk at the time. Schlager even added to the charade by wrapping his wrist in an ace bandage when friends and relatives visited.

The trial court also heard testimony from four expert witnesses. First up was the doctor mentioned in Gillespie's opening statement, Seymour Ehrenpreis, a professor of pharmacology at the University of Chicago. He explained that he had been retained by Gillespie and was prepared to testify that abrupt withdrawal from Calan SR could cause "confusion, insomnia, psychotic symptoms, shakiness, somnolence and ... bizarre dreams, nightmare type dreams." He also opined that any effects would subside after 4 to 5 days. On cross, he stated that he was not aware Diane and Schlager's daughter would testify that Schlager was no longer taking Calan SR in the weeks before the incident. Dr. Ehrenpreis stated that if he had known that was the case, he probably would not have agreed to testify. Finally, Dr. Ehrenpreis noted he had recommended that Gillespie contact Dr. Miodrag Radulovacki, an expert on the relationship between pharmacology and sleep disorders, and consider using him as a rebuttal witness if the State presented expert testimony.

Dr. Radulovacki then took the stand. He stated that Schlager was experiencing a Calan SR-induced episode of confusional arousal when he attempted to smother his wife. On cross-examination, however, Dr. Radulovacki testified that the Physician's Desk Reference does not recognize that Calan SR withdrawal causes insomnia or nightmares. He also opined any effects from discontinuing use of the drug would diminish within 48 hours. Finally, Dr. Radulovacki admitted he did not know Schlager had told police he had not taken any medication in the 72 hours before his arrest or that Schlager's wife and daughter would testify he had stopped taking Calan SR 3 to 4 weeks before the attack. Dr. Radulovacki stated if that were true, the significance of his opinion would be diminished.

Next, Dr. Rosalind Cartwright, Ph.D., a well-known expert on sleep disorders, testified that she had been contacted by Dr. Harris Berenbaum, Schlager's psychologist, and that, after reviewing the police reports, she agreed Schlager had suffered an episode of confusional arousal. She told Dr. Berenbaum she was willing to testify but received a call the next day stating that the jury had already returned a verdict. Finally, Dr. Cartwright testified insomnia had been linked to Calan SR but that drug withdrawal is not a necessary ingredient for confusional arousal.

Dr. Berenbaum batted cleanup. He testified that Schlager must have suffered an episode of night terror or confusional arousal. In addition, he stated that a few days before trial he told Gillespie that Dr. Cartwright was willing to pitch in with the defense, but Gillespie replied that neither his nor Dr. Cartwright's testimony would be needed.

After the experts wrapped up their testimony Gillespie took the stand. He explained that Schlager made the ultimate call not to testify. Gillespie stated he initially believed Schlager should testify but changed his mind as the State's case came in. He also noted because Schlager's medication came from free samples and was not backed by a written prescription, any defense based on Calan SR would turn on Schlager's credibility. Based on a "gale of evidence" that Schlager was no longer taking the medication and Schlager's long history of telling lies, Gillespie thought mounting a Calan SR defense was simply not worth the risk of subjecting Schlager to cross-examination. Gillespie also stressed the defense theory was that Schlager had a nervous breakdown and could not have acted intentionally. He stated that he believed—and Schlager agreed—that the 45–minute audiotape, the police reports, and other testimony adequately revealed Schlager's remorse, the stress he was under, and his lack of sleep. Finally, Gillespie pointed out that the trial judge had agreed to give instructions on lesser included offenses (simple assault and simple battery), so he thought Schlager's best bet was to simply put the State to its burden of proving the elements of attempted first degree murder beyond a reasonable doubt.

Based on the testimony of all of the witnesses, the trial judge denied Schlager's re-

quest for a new trial and sentenced him to 13 years in prison. Schlager appealed, repeating his claim that Gillespie's performance was deficient because he failed to carry through on promises made in his opening statement (that Schlager and Dr. Ehrenpreis would testify) and that he should have pursued a defense based on Calan SR and confusional arousal.

The Illinois Appellate Court didn't buy either argument. The court found Gillespie's decisions to forego placing Schlager on the stand and mounting a defense based on Calan SR or confusional arousal were strategic moves that fell within the wide range of reasonable professional assistance. The court also determined that Schlager had not shown prejudice from either of the alleged errors. In reaching those conclusions, the court noted that Schlager made his decision not to testify based on Gillespie's reasonable belief that cross-examination would deliver a devastating blow to the defense. The court then reasoned once Schlager decided not to testify, any expert testimony would have lacked strong foundational support. After all, a defense based on Calan SR or confusional arousal could only succeed if the jury believed Schlager had accurately reported the date on which he stopped taking the drug and truthfully described his insomnia and nightmares. Given his penchant for lying, that seemed like a stretch. In addition, the court pointed out that based on the audiotape, police reports, and witness testimony, Gillespie thought he had a good shot at selling the jury on a nervous breakdown theory or, in the alternative, getting a conviction on a lesser included offense. Finally, the court noted that in his closing argument, Gillespie explained Schlager decided not to testify because the prosecution had failed to show that he had acted intentionally.

Hoping that the third time might be the charm, Schlager repeated his allegations of ineffective assistance of counsel in his federal habeas petition. However, he did not meet with any greater success in federal court. The district court, like both the state trial and appellate courts, found Schlager could not meet either prong of the *Strickland* test. *See Schlager v. Washington,* 887 F.Supp.

1019 (N.D.Ill.1995). Schlager then filed this appeal.

Our review of Schlager's petition is governed by 28 U.S.C. § 2254(d), a provision enacted as part of the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214. To succeed under the new habeas provision, Schlager must show that the Illinois Appellate Court's denial of his ineffective assistance claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *Lindh,* 96 F.3d at 861. The Supreme Court case governing a defendant's right to effective assistance of counsel is *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To prevail under *Strickland,* Schlager must show that (1) his lawyer's conduct fell below an objective standard of reasonableness and (2) he was prejudiced by the attorney's deficient performance.

■ Schlager first suggests that the Illinois Appellate Court's decision produced a result contrary to *Strickland.* He argues that the state court held he could not establish prejudice unless he proved the jury would have acquitted him, while *Strickland* only requires that he demonstrate that a different verdict was "reasonably likely." The state court properly interpreted *Strickland.* As it stated, "a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would *reasonably likely* have been different absent the errors." *Schlager,* 187 Ill.Dec. at 561, 617 N.E.2d at 1282 (quoting *Strickland,* 466 U.S. at 696, 104 S.Ct. at 2069) (emphasis added).

■ Schlager primarily contends the Illinois Appellate Court applied *Strickland* unreasonably. But we find no error in the state court's reasoning, let alone a flaw grave enough to render its decision unreasonable. Although Gillespie, in his opening statement, predicted that both Schlager and Dr. Ehrenpreis would testify, the state appellate court found his decision to change course and forego their testimony was justifiable trial strategy rather then prejudicial error. This is

hardly an unreasonable conclusion. After the prosecution played its cards, Schlager rolled the dice and elected not to testify. The postconviction hearing made clear that Schlager's decision was based on Gillespie's assessment of the State's case and the fact that the audiotape, police reports, and witness testimony had already set the stage for a defense that Schlager did not act intentionally. As a result, Gillespie reasoned that Schlager should not run the risk of sinking his own ship on cross-examination. That was probably a wise move given Schlager's track record for truthfulness. Once Schlager decided not to testify it would have made little sense to call Dr. Ehrenpreis, whose testimony was based on Schlager's truthful reporting of when he had stopped taking Calan SR. Given Schlager's credibility problems, and the fact that two members of Schlager's family were set to testify that he had not taken the medication for 3 to 4 weeks before the attack, Dr. Ehrenpreis' testimony would not have gone far. Finally, in his closing argument Gillespie explained why the defense did not call Schlager or Dr. Ehrenpreis. He told the jury although Schlager initially planned to take the stand—even though he had no duty to do so—the defense decided additional testimony was unnecessary since the prosecution had not been able to prove, beyond a reasonable doubt, that Schlager acted intentionally. This was not all that unusual, for sometimes trials take unpredictable twists. To meet those twists, a plan at the start of a trial sometimes must be adjusted to meet changed circumstances. That's what happened here, and we can't say Gillespie (or Schlager) made the wrong call—in fact, to us, the decision was more than sensible. Once Schlager's full tape recording got in—with Schlager "testifying" uninhibited by cross-examination—the defense position in this case, it seems to us, was as good as it could ever hope to be.

■ The Illinois Appellate Court also found Schlager had not shown Gillespie's failure to consult Drs. Radulovacki and Cartwright and put on a Calan SR or confusional arousal defense constituted ineffective assistance of counsel. For many of the same reasons discussed in the context of Schlager's first ineffective assistance allegation, we again find the state appellate court's application of *Strickland* entirely reasonable. First, we note that Schlager is now trying to distinguish between a defense based on Calan SR and one based on confusional arousal. However, in both the state and district courts he consistently linked confusional arousal to abrupt withdrawal from Calan SR. In fact, although Dr. Cartwright did testify that Calan SR may have had nothing to do with his alleged episode of sleep dysfunction, Dr. Ehrenpreis stated that had he known Schlager had stopped taking the drug weeks before the attack, he probably would not have agreed to testify.

■ However, even if they had been presented as separate creatures below, both defenses rise or fall with Schlager's credibility. Because Schlager's use of Calan SR and his alleged recurring nightmare were self-reported and could not be confirmed by objective evidence, neither a Calan SR nor sleep disfunction defense would have gone anywhere unless the jury believed Schlager. Again, that brings us right back to Schlager's credibility problems and Gillespie's reasonable belief that Schlager would have gone down in flames on cross-examination. Finally, we make short work of Schlager's claim that Gillespie's failure to consult Drs. Radulovacki and Cartwright resulted in ineffective representation. Although Gillespie did not personally chat with either expert, Dr. Ehrenpreis and Schlager consulted with Dr. Radulovacki, and Dr. Berenbaum contacted Dr. Cartwright. Schlager, Dr. Ehrenpreis, and Dr. Berenbaum in turn reported their conversations to Gillespie. Gillespie testified that he planned to call Drs. Cartwright and Radulovacki only as surrebuttal witnesses if the State presented an expert witness in its rebuttal case. Because Gillespie decided not to pursue a defense based on Calan SR or confusional arousal, the State did not put on a rebuttal case and surrebuttal testimony was unnecessary. As a result, Schlager cannot meet either prong of *Strickland*.

Because the Illinois Appellate Court's application of *Strickland* was not unreasonable, Schlager must lose this case under the new law, applicable to his claim under *Lindh*.

But we hasten to add that even under the old law, this appeal would come up dry. For the reasons we have noted, we AFFIRM the district court's decision and deny Schlager's petition for a writ of habeas corpus.