**Warren Lee HARRIS, Petitioner–Appellant,**

v.

**Marvin REED, et al., Respondents–Appellees.**

No. 86–2032.

United States Court of Appeals, Seventh Circuit.

Remanded Feb. 22, 1989.

Decided Feb. 2, 1990 [1].

Rehearing and Rehearing En Banc March 13, 1990.

---

1. The Supreme Court's remand required this court to review the merits of petitioner's ineffective assistance claims at trial. However, the record on appeal transmitted to the court was inadequate for the purposes of conducting such a review. The court was thus required to reconstruct the entire record of this litigation through numerous sources before petitioner's claims could be fairly and adequately addressed.

E. King Poor and Kimball R. Anderson, Winston & Strawn, Chicago, Ill., for petitioner-appellant.

Neil F. Hartigan, Atty. Gen., Office of the Atty. Gen., Chicago, Ill., for respondent-appellee.

Before BAUER, Chief Judge, CUDAHY and POSNER, Circuit Judges.

BAUER, Chief Judge.

Warren Lee Harris' appeal from the district court's order denying his petition for habeas corpus is before us on remand from the United States Supreme Court. *Harris v. Reed,* —— U.S. ——, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989). The issue that this court must address is whether Harris' state court conviction for murder was obtained in contravention of his sixth amendment right to effective assistance of counsel. Our independent review of the facts, which we specifically limit to those relating to petitioner's claims on appeal, reveals that there is a reasonable probability that the unprofessional errors committed by Harris' trial counsel affected the outcome of his trial. Accordingly, the district court's order denying Harris' petition is reversed and remanded with directions to issue the writ.

## I. Factual Background

At approximately 9:30 p.m. on July 9, 1977, Ernest Howard was shot while on the west side of South Christiana Street near the intersection of 16th Street.[2] Upon being shot, Howard called out to Maurice Williams, a friend of his who was across the street. Before police arrived, Howard told Williams that he had been robbed and shot and that he knew the names of his assailants. Howard later died at Mt. Sinai Hospital without naming the assailants.

Police investigated the murder and prepared a report containing the names of a number of individuals who saw a man flee from the direction of the shooting. Leroy Carter was the first of these witnesses. Carter lived on Christiana Street near the location of the shooting. He told police that on the night of the shooting, he was sitting in his car in front of his house when he heard the shot and saw a black male running in a northeasterly direction away from the intersection of Christiana and 16th into a nearby playground. At a police

---

2. South Christiana is a one-way, south-bound street located on Chicago's south side. Six-

teenth Street is a two-way street that runs east and west.

lineup three days later, Carter identified Melvin McWhorter as the man he saw fleeing from the incident.

The police also interviewed Alice Riles, another Christiana Street resident who stated that she was sitting on the front porch of her house when she heard the shot. She then saw two men flee in a northeasterly direction away from the scene into a vacant lot near the playground. Riles also independently identified McWhorter in the lineup as one of the men she saw.

Based upon the statements of these witnesses, the police questioned McWhorter, who denied both being in the area and any knowledge of the shooting. When police questioned him again the next day, he admitted that he had originally lied. He stated that he had been near Christiana and 16th on the night of the murder in an attempt to buy drugs. He said he heard a shot that night and then saw Warren Harris walk southbound on Christiana away from the scene and turn west on 16th Street.

McWhorter was the prime suspect in the shooting until approximately a month later when the police received a tip from an unidentified informant that Antonio Slater had witnessed the incident. Police then interviewed Slater, who told them that on the night of the incident, he was driving down 16th Street and turned onto Christiana. He stated that while he was on 16th Street, a car in front of him caused him to slow down, at which time he heard the shot and saw Harris run toward a light colored Buick, get inside, and drive past his vehicle.[3] After reviewing police photographs, Slater identified a picture of Harris as the man he saw enter the Buick and drive away. The police arrested Harris later that day and he was subsequently charged with murder.

Todd Musberger, a Cook County Public Defender, was appointed to represent Harris.[4] Harris' trial began on December 15, 1977, and lasted three days. At trial, Musberger was assisted by Kathryn Kuhlen, who gave the opening statement for defendant. During the opening, Kuhlen emphasized that Melvin McWhorter would figure quite prominently in the trial. She assured the jury that they would hear evidence supporting an account of the shooting different from that offered by the prosecution:

> To understand the importance of Mr. McWhorter and of Antonio Slater, it is necessary to give you a brief review of the police investigation in this case. During the days immediately following the shooting of Ernest Howard the police talked to a number of people who were present in the area of 16th and Christiana, people who lived there and also to relatives of Ernest Howard. They learned that Ernest Howard was a narcotics dealer who sold in that neighborhood at 16th and Christiana.

> \*     \*     \*     \*     \*     \*

> We believe the evidence will show that the police learned that two persons immediately after the shooting were seen running away from the scene of the shooting in a northeast direction through a lot on the north side of Christiana. Through further investigation, the police learned that one of those individuals was Melvin McWhorter. They had Melvin McWhorter come to Area Four Police Headquarters, advised him of his rights and interrogated him.

> At that time, he denied knowing anything about the shooting. They then placed McWhorter in a lineup and two persons identified him as one of the indi-

---

**3.** The significance of this version of the incident is that if Slater was driving "down" 16th Street and turned onto Christiana, he would have been beyond the location of the incident when he allegedly witnessed the shooting (recall that Christiana is a one way street heading south). To that extent, Slater could not have driven the route that he claimed and happened upon the shooting.

**4.** In early 1977, Musberger was assigned to the Murder Task Force of the Public Defender's Office. Although he had tried approximately six felony jury trials prior to 1977, Harris' case was his first felony murder trial.

viduals they had seen running away from the scene immediately after the shooting.

The police then confront Mr. McWhorter again and Mr. McWhorter changes his story and says what he said before was a lie, and then tells the police that he had gone into that neighborhood to purchase narcotics, that he was across the street at the time of the shooting but that he didn't see the shooting itself.

At this point Melvin McWhorter is a chief suspect in the focus of the police investigation, and it is at this point, some six weeks after the shooting, that the name Antonio Slater appears before the police. This is a man who, mind you, who has never come forward to the police in six weeks after the shooting, it is also a person who none of the people interviewed by the police at the scene had named to the police as one of the men who had been in that area and who possibly had witnessed the shooting. Antonio Slater gives this name to police and at that point the focus of the investigation shifts away from Melvin McWhorter.

At trial, the prosecution proceeded to present a total of six witnesses. The first of these was Howard's father, who testified that he identified his son's body at the morgue. Maurice Williams, the second witness, testified about attempting to assist Howard at the scene. Consistent with his account given to the police investigating the incident, Williams also testified that he recognized McWhorter in the crowd that gathered subsequent to the shooting. Officer Michello was the prosecution's third witness. He testified about the events he witnessed upon arriving at the scene of the shooting. The prosecution also called two witnesses who testified that Howard died as a result of a gun shot wound.

· Antonio Slater was the prosecution's only witness whose testimony linked Harris to the shooting. At trial, Slater's testimony about his route prior to the incident was critically different from the account he gave to the police. This time, Slater testified that he was traveling southbound on Christiana past 15th street when he arrived upon the scene. He said that he heard a gun shot and saw a man push a victim to the ground approximately 12 feet in front of the car blocking his progress on Christiana. He then watched the assailant run to this car, turn to face Slater with his pistol drawn, enter the car and drive off. Slater stated that under the street lights and the headlights of his car, he was able to identify the assailant as Harris. He claimed that he was familiar with Harris because he had seen him approximately two years earlier at a nearby pool hall.

In his cross-examination of Slater, Musberger asked the witness why he waited for six weeks before talking to police. Musberger also questioned Slater about the discrepancy between his trial testimony and his earlier account of the evening given to police. When Slater denied the earlier version, Musberger dropped the issue. At the end of the day, the prosecution rested.

When the trial reconvened on the following morning, December 21, 1977, Musberger informed the court that he would not put on any witnesses and that he was resting on behalf of the defense. As part of this decision, Musberger chose not to enter a stipulation prepared with the prosecution. The stipulation stated that if Officer Shine were called to testify, he would confirm that Slater's earlier version was that he had been traveling "down" 16th Street and turned onto Christiana when he witnessed the incident. In his closing, Musberger did highlight the differences between Slater's two accounts. Nonetheless, the jury returned a guilty verdict that day after the case was submitted to it. Harris was subsequently sentenced to a period of 50 to 100 years in a state penitentiary.

## II. Procedural History

The procedural history of this case before the Illinois courts is thoroughly reviewed in the District Court's published order denying, in part, respondent's motion for summary judgment on Harris' petition for habeas corpus. *United States ex rel. Harris v. Reed*, 608 F.Supp. 1369, 1373–75 (N.D.Ill.1985). Briefly, Harris was represented by an Illinois Appellate Defender in his direct appeal. The Appellate Defender

raised only one claim on appeal: the prosecution failed to establish Harris' guilt beyond a reasonable doubt. The Illinois Appellate Court affirmed the conviction in an unpublished opinion. *People v. Harris*, 71 Ill.App.3d 1113, 30 Ill.Dec. 341, 392 N.E.2d 1386 (1979). Harris then prepared a *pro se* petition for post conviction relief in which he raised a claim of ineffective assistance of counsel. He also sought a new trial based upon newly discovered evidence. Private counsel for Harris filed an amended post-conviction petition limited to the ineffective assistance of counsel claim. After holding hearings on the petitions, the lower court denied relief. This decision was affirmed on appeal.

Harris also filed a *pro se* petition for habeas corpus in federal court in which he raised numerous grounds supporting his ineffective assistance of counsel claim.[5] *See United States ex rel. Harris v. Reed,* 608 F.Supp. at 1374. Harris also raised a claim of post-conviction delay and newly discovered evidence. The district court granted respondents' motion for summary judgment relative to the latter two claims and denied the motion on the ineffective assistance claim. The district court rejected respondents' waiver argument on this issue because it concluded that the state appellate court had ignored the procedural default and had addressed the merits of the ineffective assistance claim. *Id.* at 1377. Therefore, the district court determined that it was also free to reach the merits of the ineffective assistance claim on collateral federal review. It ordered that an evidentiary hearing be held and appointed counsel to represent Harris. *Id.* at 1385.

In November of 1985, the district court heard testimony and received evidence during the three-day hearing on Harris' ineffective assistance claim. Musberger was examined at length, but could not remember a great deal about the trial or the strategy underlying his decisions. Although Musberger stated that he obtained the police records through discovery, he could not recall the number of witness he interviewed or who they were.[6] The district court's following findings of fact, rendered in an unpublished opinion, relate directly to Harris' arguments in the present appeal:

> Musberger could not recall what specific efforts he made to interview the witnesses named in the police files. He recalled making such efforts generally but having very little success in finding witnesses whose testimony would have been helpful.... Leroy Carter ... testified that he never spoke to a defense attorney before trial. The court finds that neither Carter nor [Alice] Riles were among the witnesses contacted prior to trial.
>
> \*   \*   \*   \*   \*   \*
>
> Just before opening statement, Kuhlen advised the court that both Alice Riles and Leroy Carter 'might be called in rebuttal, depending on what the state has.' Leroy Carter recalled that on the day he showed up at the courtroom he spoke to a male lawyer who told him that they may need him and then they might not. The court finds that the person was probably Musberger, even though Musberger himself could not recall the interview, since Carter would have been of no use

5. Harris' grounds supporting his ineffective assistance claim were as follows: (1) Counsel failed to interview or call police investigators to impeach the testimony of Slater, (2) Counsel failed to interview or call Carter or Riles, who identified McWhorter as a man fleeing from the scene, (3) Counsel failed to investigate or to call George Williams, who told police that Harris was not at the scene, (4) Counsel failed to investigate or call investigator Shine, who reported Slater's original account of the incident, (5) Counsel failed to offer the agreed Shine stipulation into evidence, (6) Counsel failed to investigate or call residents living in the area of the alleged pool hall in which Slater said he saw

Harris, (7) Counsel failed to investigate or call four of Harris' alibi witnesses, and (8) Counsel failed to fully investigate or call any of the doctors at Cook County Hospital who Harris claims would have corroborated the story of his alibi witnesses.

6. Notwithstanding the names of the witnesses contained in the police reports, Musberger testified that he could recall interviewing only two women in the area of the incident. He had no specific recollection of interviewing Carter, Riles or Slater. He also confirmed that he did not interview McWhorter or George Williams.

to the prosecution. Had Carter been called to testify, he would have said that he saw a man other than Harris running across a playlot shortly after the shooting, and that the man was the same he'd identified at the police line-up.

\*  \*  \*  \*  \*  \*

On December 21, 1977, the defense rested without putting on any evidence. Harris first learned of counsel's decision not to put on a defense earlier that morning, when Musberger advised him that Slater had been successfully impeached. Harris went along on counsel's advice. Musberger recalled that at the time the state had closed their case, he and Kuhlen felt that the prosecution's case was weak and that the jury "would be out a very short time and give a not guilty to our client," and that this was the "biggest reason" why no witnesses were called. Musberger also must have been aware that this meant abandoning the McWhorter line of defense, since he orally moved to preclude the state from commenting in closing on Kuhlen's opening statement.

*United States ex rel. Harris v. Reed,* No. 80 C 513, 9–16, 1986 WL 6396 (N.D.Ill. May 30, 1986) (Available on LEXIS, Genfed library, Dist. file) (citations to transcripts omitted).

Relying on the principles enumerated in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the district court proceeded to render its conclusions of law. With reference to counsel's failure to call Carter or Riles, the court determined that the evidence supporting Harris' allegation of ineffective assistance was "very close." Candidly, the court expressed puzzlement over Musberger's strategy "since Riles' and Carter's testimony might have raised doubt by suggesting that the men running from the scene were in fact the assailants, and Musberger's belief in a probable acquittal would not excuse putting on further helpful evidence." Nonetheless, the court concluded that counsel did not render ineffective assistance by abandoning the McWhorter theory as Harris' line of defense. The court concluded

that the McWhorter theory may not have been viable as a defense, and that Musberger did not act ineffectively by dropping it after conducting further interviews during trial and measuring the prosecution's "perceptibly weak case." *Id.* at 28. For this reason, the court denied Harris petition.

Harris appealed, limiting his claims to the contentions that Musberger rendered ineffective assistance by failing to put Riles and Carter on as defense witnesses, and by failing to submit the Officer Shine stipulation into evidence. This court affirmed after determining that Harris waived the right to bring his ineffective assistance claims by failing to raise them on direct appeal. *Harris v. Reed,* 822 F.2d 684 (7th Cir.1987). Although we found the state appellate court's order vague on this point, a majority of the panel concluded that the federal courts "should try to assess the appellate court's intention to the extent that it is possible." *Id.* at 687. In a concurring opinion, Judge Cudahy disagreed with this portion of the opinion, stating that "rather than attempting to divine the unspoken 'intent' of [the state] court, I think we should invoke a presumption that waiver not clearly found has been condoned.... Certainly it is within the state court's power to protect their procedural requirements merely by making express findings that a petitioner has waived." *Id.* (Cudahy, J., concurring).

The United States Supreme Court granted Harris' subsequent petition for certiorari. 485 U.S. 934, 108 S.Ct. 1107, 99 L.Ed.2d 268 (1988). In his opinion for the Court, Justice Blackmun noted that the conflict stated in our opinion mirrored the conflict among the circuits on the issue. *Harris,* 109 S.Ct. at 1041. The majority of the Court agreed with Judge Cudahy's view, holding that the "plain statement rule" enumerated in *Michigan v. Long,* 463 U.S. 1032, 1042 and n. 7, 103 S.Ct. 3469, 3477 and n. 7, 77 L.Ed.2d 1201 (1983), was equally applicable to a case on federal habeas review. *Id.* at 1044, 103 S.Ct. at 3478. The Court reversed our original decision and remanded. *Id.* at 1045, 103 S.Ct. at 3479.

On remand, this court turns to the merits of petitioner's claims.[7]

## III. Analysis

The sixth amendment guarantees that a criminal defendant will not be convicted without the effective assistance of counsel. In *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court enumerated the now familiar principles governing a convicted defendant's claim that his or her counsel rendered constitutionally ineffective assistance at trial. In broad strokes, "[t]he benchmark for judging a claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686, 104 S.Ct. at 2064. The burden upon a defendant pressing such a claim is a "heavy one." *Sullivan v. Fairman*, 819 F.2d 1382, 1390 (7th Cir.1987). The defendant must affirmatively establish that counsel's performance was both constitutionally deficient and that the deficiency prejudiced the outcome of the trial.

### A. Musberger's Performance as Defense Counsel

This case highlights many of the reasons why an appellate court's review of counsel's performance must be highly deferential. As the court seeks to "reconstruct the circumstances of counsel's challenged conduct," it is particularly difficult "to eliminate the distorting effects of hindsight." *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. The temptation to read the one-dimensional record on appeal and unwittingly take up the role of the "Monday morning quarterback" is ever present. In the context of ineffective assistance claims, appellate judges—who are often drawn from the trial bar and who are generally expected to be omniscient in all other respects—must quell the tendency to call the plays they think should have been called. A reviewing court must seek to "evaluate

the conduct from counsel's perspective at the time." *Id.* at 689, 104 S.Ct. at 2065. Additionally, the court must labor under "a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. at 2065. With reference to petitioner's allegations that counsel failed to render constitutionally adequate assistance:

> *Strickland* requires a reviewing court to 'determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.' [466 U.S.] at 690 [104 S.Ct. at 2066]. It will generally be appropriate for a reviewing court to assess counsel's overall performance throughout the case in order to determine whether the 'identified acts or omissions' overcome the presumption that a counsel rendered reasonable professional assistance. Since '[t]here are countless ways to provide effective assistance in any given case,' *id.*, at 689 [104 S.Ct. at 2065], unless consideration is given to counsel's overall performance, before and at trial, it will be 'all to easy for a court, examining counsel's defense after it has proven unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.' *Ibid.*

*Kimmelman v. Morrison*, 477 U.S. 365, 386, 106 S.Ct. 2574, 2588, 91 L.Ed.2d 305 (1986). Finally, this court is not free to question the objectively reasonable strategic decisions of counsel. As the Supreme Court emphasized in *Strickland*, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable...." *Id.* 466 U.S. at 690, 104 S.Ct. at 2066.

With these principles in mind, we turn to the district court's findings of fact and conclusions of law. The district court painstakenly reviewed Harris claims and found that Musberger's pretrial investigation was, at best, truncated. With reference to the claims on appeal, the court concluded that he did not attempt to interview Carter or Riles prior to trial. In light

---

7. On appeal, the district court's findings of fact rendered after the evidentiary hearing are reviewed under the clearly erroneous standard of

Fed.R.Civ.P. 52(a). *U.S. ex rel. Smith v. Lane*, 794 F.2d 287, 289 n. 3 (7th Cir.1986).

of this finding, defense counsel's opening argument is particularly disturbing. In the opening, counsel showed an understanding that the McWhorter theory, if believed, would account for the strange investigative turn taken in this case. If the jury was willing to credit the testimony of Carter and Riles, it would have further discredited Slater's account, augmented the cross-examination of Slater, and provided the jury with a viable basis for clinging to the presumption that Harris was innocent. There is little objective reason to believe that the jury would not credit the testimony of Carter and Riles. They were contacted by the police soon after the incident. They were unbiased witnesses whose account of what they saw largely corroborated each others'. Finally, both witnesses positively identified McWhorter as the man (or one of the men) they saw fleeing from the scene.

■■ The district court explicitly expressed its puzzlement over Musberger's decision not to put these witnesses on. However, the court went on to construct a trial strategy supporting counsel's decision. This court finds that the district court's factual findings on this score are clearly erroneous. Just as a reviewing court should not second guess the strategic decisions of counsel with the benefit of hindsight, it should also not construct strategic defenses which counsel does not offer. *Kimmelman*, 477 U.S. at 386, 106 S.Ct. at 2588. The role of the court on review is to "evaluate the conduct from counsel's perspective at the time." *Id.* (quoting *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065). Musberger did not offer the strategic justifications provided by the district court. *See Crisp v. Duckworth*, 743 F.2d 580, 584 (7th Cir.1984) (counsel should not be allowed to shield his failure to investigate simply by raising claim of "trial strategy and tactics"). Rather, Musberger stated that the "biggest reason" he decided not to call any witnesses, including Carter and Riles, was that he felt the prosecution's case was weak and that the jury "would be out a very short time and give a not guilty

to our client." Harris' account of his conversation with Musberger on the morning that Musberger decided to rest without putting on any defense supports Musberger's justification for his decision. Harris' testimony is particularly telling:

HARRIS: As soon as he walked up to the bars [of the lockup] with the bailiff, he said, "we are going to rest our case today."

I said, "What?"

"We are going to rest our case today." I Said, "Why didn't you put on no witnesses?" We got in a disagreement about it. The bailiff started opening the bull pen to let me out, and me and him started talking.

So I tell him, I said, "I feel something funny, Mr. Musberger. I think we should put on some evidence."

He mentioned to me, he said, "We did impeach the guy's testimony. I think the jury is going to rule in your favor."

COUNSEL: What happened next?

HARRIS: I took his word for it.

Under the circumstances, we conclude that counsel's overall performance, including his decision not to put on any witnesses in support of a viable theory of defense, falls outside the wide range of professionally competent assistance. *Cf. Montgomery v. Petersen*, 846 F.2d 407, 412 (7th Cir.1988) (nonstrategic decision not to investigate is inadequate performance); *United States ex rel. Cosey v. Wolff*, 727 F.2d 656 (7th Cir.1984) (defense counsel's out-of-hand rejection of potential witnesses and decision not to call witness because prosecution's case was so weak falls below the minimum standards of professional competence). *See also Chambers v. Armontrout*, 885 F.2d 1318, 1323 (8th Cir. 1989) (counsel's decision not to interview and present witness supporting defendant's self-defense theory meets deficiency prong); *Smith v. Wainwright*, 741 F.2d 1248, 1254 (11th Cir.1984).[8] Counsel tempted the fates when he decided to rest on the

---

**8.** The circumstances here reveal that this is not an instance where counsel chose, as a matter of sound trial strategy, not to put on any defense

because the defense theory was an "incredible" one. *See United States v. Ramsey*, 785 F.2d 184, 194 (7th Cir.1986).

perceived weakness of the prosecution's case. His decision not to present the McWhorter theory through the testimony of Carter or Riles—a decision made without interviewing the witnesses, after preparing the jury for the evidence through the opening, and without consultation with Harris—was unreasonable professional conduct. In addition, counsel's failure to present the agreed stipulation regarding Officer Shine's possible testimony is equally inexplicable as part of counsel's entire conduct at trial.

### B. Prejudice Arising From Counsel's Ineffective Assistance

 *Strickland* holds that "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* 466 U.S. at 691, 104 S.Ct. at 2066. The defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome [of the trial]." *Id.* at 694, 104 S.Ct. at 2068.

In the present case, petitioner has met this burden. Harris has shown that the testimony of Carter and Riles would have greatly aided his case. Nonetheless, counsel decided not to present these available witnesses; he chose to gamble on his perceptions about the weakness of the prosecution's case. By resting without presenting any evidence in favor of the defense, counsel left the jury free to believe Slater's account of the incident as the only account. In fact, counsel's opening primed the jury to hear a different version of the incident. When counsel failed to produce the witnesses to support this version, the jury likely concluded that counsel could not live up the claims made in the opening. *See Anderson v. Butler,* 858 F.2d 16, 29 (1st Cir.1988) (failure to produce expert witnesses in support of defense theory introduced in opening statement is a "speaking silence" that is prejudicial as a matter of law).

### IV. Conclusion

Our confidence in the outcome of Harris' trial has been undermined. We believe that he has raised a reasonable probability that counsel's unprofessional omissions "undermined the proper functioning of the adversarial process." *Strickland,* 466 U.S. at 686, 104 S.Ct. at 2064. We cannot say that the trial—turning as it did on the questionable testimony of a single witness—can be "relied on as having produced a just result." *Id.* at 686, 104 S.Ct. at 2064. Accordingly, the district court's denial of Harris' petition for habeas corpus is hereby reversed and the case remanded to the district court with directions to grant the writ of habeas corpus, directing the state to re-try Harris within one hundred twenty days or release him.

REVERSED AND REMANDED WITH DIRECTIONS.