UNITED STATES of America ex rel.
Seymore SCHLAGER, Petitioner,

v.

Odie WASHINGTON, Respondent.

No. 94 C 4383.

United States District Court,
N.D. Illinois,
Eastern Division.

May 1, 1995.

**1020**

Allan A. Ackerman, Allan A. Ackerman, P.C., Adam J. Brenner, Chicago, IL, for petitioner Seymore Schlager.

Michael A. Hurst, Arleen C. Anderson, Ill. Atty. Gens. Office, Chicago, IL, for respondent Odie Washington.

Arleen C. Anderson, Ill. Atty. Gens. Office, Chicago, IL, for Atty. Gen. of State of Ill.

Cary S. Fleischer, Alan R. Dolinko, Chuhak & Tecson, Chicago, IL, for plaintiff Vein Clinics of America, Inc.

Thomas Vincent Canepa, John J. Cummins, Thomas V. Canepa & Associates, Chicago, IL, for defendants Texas Phlebology Associates, P.A., Raphael Emanuel, Jr., M.D.

### MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

Petitioner Seymore Schlager ("Schlager") petitions for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. Schlager contends that he was denied effective assistance of counsel at trial when his defense counsel (1) failed to fulfill promises made in opening statement; and (2) chose not to pursue a "confusional arousal" defense. Schlager was convicted by a jury in the Circuit Court of Lake County, Illinois, for the attempted murder of his wife and was sentenced to 13 years in prison. For the reasons set forth below, Schlager's Petition for a Writ of Habeas Corpus is denied.

### BACKGROUND

**A. Facts** [1]

On February 12, 1991, Schlager returned to his Highland Park, Illinois, home from Abbott Laboratories where he worked as a medical director. He took a nap, ate dinner at 7:00 p.m., and at 10:00 p.m., told his two

---

**1.** Unless otherwise indicated, the following facts are gleaned from the Illinois Appellate Court opinion, reported at *People v. Schlager*, 247 Ill. App.3d 921, 187 Ill.Dec. 554, 617 N.E.2d 1275 (2d Dist.), *appeal denied* 152 Ill.2d 575, 190 Ill. Dec. 906, 622 N.E.2d 1223 (1993). *See Sumner v. Mata*, 449 U.S. 539, 547, 101 S.Ct. 764, 769, 66 L.Ed.2d 722 (1981); *Hockett v. Duckworth*, 999 F.2d 1160, 1165 (7th Cir.1993) ("Under 28 U.S.C. § 2254(d), we presume that state court findings of fact are correct if the findings are made after a hearing on the merits, and are fairly supported by the record."). Citations to the record in this case are indicated by "R. ——."

teenage children to go to bed. After he and his wife, Diane, watched the evening news, they retired to the bedroom. Schlager then took a shower and began to pace from the bathroom to the bedroom. Diane asked Schlager why he was pacing and he replied that he was nervous, and that she should go to bed. Shortly thereafter, she awoke because Schlager had been getting in and out of bed. She then noticed a pillow covered with plastic lying on the floor. When she asked Schlager about the pillow, he responded, "You don't want to know." *People v. Schlager*, 247 Ill.App.3d 921, 187 Ill.Dec. 554, 556, 617 N.E.2d 1275, 1277.

Next, Schlager left the bedroom and Diane fell back to sleep. She awoke again to find Schlager in the living room, at which time she asked if there was anything wrong. He told her to go back to bed, and she did. Schlager returned to the bedroom and began crying and saying that he was depressed. (R. 470) Diane suggested that they call a hospital or a psychiatrist. *Id.* Schlager stated that he could handle it himself. Still crying, he climbed on top of Diane holding her down with his weight and said that he was having a nervous breakdown. Diane attempted to console him, but he rolled off of her and told her not to touch him; she then fell back to sleep.

At about 4:00 a.m., she awoke again to find Schlager sitting at the edge of the bed. This time, however, he reached to the floor, clutched the plastic-covered pillow, leaped onto his wife, who had been lying on her back, and began to smother her with the pillow. (R. 479) Diane struggled and managed to turn onto her stomach, but Schlager then pushed her face down into the mattress, reached around and clamped her nose shut with his fingers. They struggled for approximately three to four minutes until Schlager fell off of her. She screamed for her chil-

dren to call 911. Schlager, standing at the side of the bed, then exclaimed, "What am I doing? What am I doing? You're my wife. I love you." *Schlager*, 187 Ill.Dec. at 556, 617 N.E.2d at 1277.

Regardless, Diane then ran past him to the foyer to open the front door in an attempt to trigger the security alarm, but Schlager quickly deactivated the alarm system with the proper code. He repeatedly told Diane, "Don't call, don't call." She ordered him out of the house, but he refused. *Id.* She then proceeded to the kitchen, brandished a knife, and ordered him to remain seated in the family room until the police arrived, which they did and he was arrested.

## B. Trial

At trial, Schlager's defense counsel, Terence P. Gillespie, ("Gillespie")[2] attempted to place Schlager's actions in the context of his demanding career and the stress of ending his affair with a 24 year-old co-worker named Melinda. He also stated that Schlager had been experiencing sleep dysfunction and violent dreams related to his use of a drug called Calan S.R., which Schlager self-prescribed to treat his hypertension and stress.[3] During a portion of his opening statement, Gillespie stated:

> Basically what he (Judge Tonigan) told you, [opening statements are] the framework, what the lawyers believe the evidence in this case will be. And he also gave you admonitions about opening statements. He told you that it is not evidence in the case. I'll remind of you [sic] that. What I say to you here isn't evidence. (R. 369).
>
> \* \* \* \* \* \*
>
> And you're going to hear come into this courtroom an expert who is going to come up here and talk to you about Calan and

**2.** This Court has the utmost respect for Mr. Gillespie. Like the petitioner's present counsel, Mr. Gillespie is one of the most able criminal defense attorneys in Chicago. He has been practicing law since 1978, specializing in criminal law. (R. 979) He began his legal career as an Assistant State's Attorney in the Cook County State's Attorney's Office, where he worked for five years; thereafter, he pursued a career as a criminal defense attorney. *Id.* He has had approximately

one thousand bench trials and well over one hundred jury trials at the state and federal level. *Id.* at 979–980.

**3.** Schlager received free samples of Calan S.R. from pharmaceutical companies and there were no records to establish when he first obtained or discontinued using the drug.

talk to you about what this drug, which is a relatively new drug on the market, talk to you about the side effects of it.

The doctor is going to tell you, Dr. Ehrenpreis, one of the foremost experts in the field of pharmacology in the country, if not the world, he's going to tell you that this drug Calan causes very, very severe problems in the area of sleep, very severe sleep dysfunctions, insomnia, violent terrible dreams. He is going to show you documentation in the literature about these violent, terrible dreams that people can suffer as a side effect from Calan.

Sy (referring to Schlager) is going to tell you, when he comes up to our case and he gets on the witness stand, he is going to tell you that he was suffering from violent, terrible dreams.

*Id.* at 377–378. Thereafter, Gillespie discussed other sources of stress in Schlager's life and concluded by stating that Schlager had always been a good provider for his family. Gillespie argued that the accumulation of stress in Schlager's life caused him to suffer a nervous breakdown on the night of the attack. Thus, Gillespie asserted, Schlager could not have intentionally attempted to murder his wife.

The State called Diane Schlager to testify and she gave a vivid account of the events on the night of the attack. She also told of an incident where Schlager lied about a missing five-carat cubic zirconium ("CZ") ring, which he had given to Melinda.[4] (R. 502–504) Apparently to establish motive, the State presented an audio cassette tape that Schlager made for his children after the attack in which he discusses his relationship with Melinda. Schlager also mentioned that he lied to Melinda when he told her that he could not divorce his wife, and marry her, because his wife was suffering from Hodgkin's disease.

After the State rested, Gillespie and Schlager chose not to offer a defense because they felt confident that the State had failed to prove its case beyond a reasonable doubt. Nonetheless, the trial judge, Judge Tonigan,

had the following colloquy with Gillespie and Schlager:

THE COURT: Mr. Schlager, I want to put something on the record and I'm not directing this to Mr. Schlager. Mr. Gillespie, it was indicated to me at the conclusion of evidence that's been borne that you were going to have a conference with your client in terms of how to proceed in the case, is that correct?

MR. GILLESPIE: That's correct, your Honor. We did spend a great deal of time and preparation for this trial with the possibility of Mr. Schlager testifying. That was our plan. We listened to the prosecution's case. When they rested, we then discussed over two hours I think you gave us for lunch yesterday, whether or not we were going to proceed or put the prosecution to their proof and we decided that— Mr. Schlager was actively involved in that decision making process—that we would rest our case and put the prosecution to its proof.

THE COURT: He hasn't indicated any dissatisfaction with that decision, is that correct?

MR. GILLESPIE: Not that I know of. Are you satisfied, sir?

MR. SCHLAGER: No, no, I'm not dissatisfied.

*Schlager,* 187 Ill.Dec. at 558, 617 N.E.2d at 1279. Shortly thereafter, a guilty verdict was returned and Schlager was sentenced to 13 years incarceration.

## C. Post–Conviction Hearing

Immediately after his conviction, Schlager obtained new legal representation and filed a motion for judgment notwithstanding the verdict on the ground that he was not proven guilty beyond a reasonable doubt; in the alternative, Schlager moved for a new trial due to ineffective assistance of counsel. Subsequently, Judge Tonigan conducted an extremely comprehensive (834 page) post-conviction hearing, (R. 831–1665), during which several witnesses testified, including, among others, Schlager, Diane Schlager, Carin

---

**4.** Schlager falsified an appraisal document for the $70 five-carat CZ ring to fool Melinda into

believing that the ring was actually worth $62,-000—it worked.

Schlager (his daughter), Gillespie, and several expert witnesses.

The post-conviction hearing revealed that Schlager has a long and well-established track record of lying to friends, family, and colleagues. He lied to colleagues and Abbott co-workers about his purported internal medicine certification, an examination which he actually failed. (R. 1286, 1376, 1486) He lied to law enforcement agencies and his wife and children about his affair. *Id.* at 1487–88. He lied to his wife about the missing five-carat CZ ring. *Id.* at 1281–84. He lied to his wife about an alleged New Year's business trip to Japan, when in fact, he and Melinda spent the weekend in Chicago at the Hotel Intercontinental. *Id.* at 1285–86, 1488. He lied to friends about a self-initiated rhinoplasty operation by telling people that he had been involved in a car accident in which the driver of the other car had been killed. *Id.* at 1293–96, 1428, 1488.

### 1. *Expert Witnesses*

Schlager's potential witnesses, Drs. Radulovacki, Cartwright, Berenbaum, and Ehrenpreis, testified at the hearing. Dr. Miodrag Radulovacki, M.D., Ph.D., an expert in the field of pharmacology as it relates to sleep disorders, opined that Schlager was experiencing an episode of confusional arousal the night he attempted to murder his wife. *Id.* at 1047–48, 1063–64. However, on cross-examination he acknowledged that the Physicians' Desk Reference ("PDR") does not recognize the use or withdrawal of Calan S.R. to cause insomnia because the causal relationship is questionable. *Id.* at 1079. He also agreed that the PDR does not recognize Calan S.R. to cause vivid nightmares. *Id.* Also, he stated that the side-effects of Calan S.R. would diminish after 48 hours of discontinued use; further, he indicated that he was not aware that the defendant had stopped taking Calan S.R. three to four weeks prior to the attack.[5] *Id.* at 1085–89. Consequently, since Schlager had stopped taking the drug well before the attack, Dr. Radulovacki acknowledged that the significance of his

opinion regarding the effects of the drug would be diminished. *Id.* at 1087–89.

Dr. Rosalind Cartwright, Ph.D., a sleep disorders specialist, testified on direct that insomnia was a side-effect of Calan S.R., (*Id.* at 1100), but on cross-examination she concurred that it was possible that the causal relationship has not been established between sleep disorders and Calan S.R. as indicated by the PDR. *Id.* at 1123–24.

Next, Dr. Harris Berenbaum, Ph.D., Schlager's psychologist, testified that he believed that Schlager was suffering from a sleep disorder at the time of the attack; he also testified that he suggested to Gillespie to retain Dr. Cartwright. *Id.* at 1189, 1193. However, Dr. Berenbaum noted that Gillespie was not sure whether he wanted to pursue the Calan S.R. line of defense, and upon informing Gillespie of Dr. Cartwright's willingness to testify at trial, Gillespie told him that neither his nor Dr. Cartwright's testimony would be required. *Id.* at 1194, 1199, 1201–02, 1204–08.

Finally, Dr. Ehrenpreis, a pharmacology professor at the University of Chicago, (*Id.* at 902), testified that he was contacted and retained by Mr. Gillespie to testify whether Schlager's alleged use of Calan S.R. prior to the attack may have had any adverse effects upon him. *Id.* at 908. Dr. Ehrenpreis testified that the side-effects of the drug are "confusion, insomnia, psychotic symptoms, shakiness, somnolence and bizarre or—bizarre dreams, nightmare type dreams"; although, he stated that such information is not mentioned in the PDR because Calan S.R. is a relatively new drug. It has only been on the market since 1988. *Id.* at 910–911.

On cross-examination, Dr. Ehrenpreis testified that the effects of Calan S.R. diminish after four to five days of discontinued use of the drug, and that he was unaware that both Schlager's wife and daughter would testify that Schlager had stopped taking the drug three to four weeks prior to the attack. *Id.* at 945–946. Subsequently, Dr. Ehrenpreis testified that if, in fact, Schlager had stopped

---

**5.** Both Schlager's wife and daughter, Carin Schlager, testified that Schlager informed them that he had stopped taking Calan S.R. about

three to four weeks prior to the incident. (R. 1523–24, 1516–19).

taking Calan S.R. three to four weeks prior, then "[t]here should probably be no adverse effects" at the time of the attack. *Id.* at 946–947.

### 2. *Mr. Gillespie*

Gillespie testified that he initially opined that Schlager should testify, but as the trial progressed, he changed his mind. *Id.* at 994–996. He stressed, however, that Schlager made the final decision not to testify. *Id.* at 985–986, 996. Gillespie also noted that the State had an abundance of evidence to attack Schlager's credibility and, ultimately, the alleged use of Calan S.R. rested entirely on Schlager's credibility as to when he stopped taking Calan. *Id.* at 1003–06. He stated that "Schlager never told me he had experienced night terrors, nor did the defense rest upon him having night terrors or withdrawing from Calan. This was never in the case. It was problematic because there was a gale of evidence out there he wasn't taking the drug at all." *Id.* at 1509. Rather, the defense in the case was that Schlager did not have the requisite mental state; that he did not intentionally attempt to take the life of his wife; and that it was not a conscious intentional act on his part. *Id.* at 1557. Also, after Judge Tonigan advised Gillespie that Drs. Berenbaum and Ehrenpreis could only testify as to their knowledge of sleep dysfunction in general, and not about Schlager's sleep dysfunction, he made a strategic decision not to call them for such a limited purpose. *Id.* at 1000–03.

Additionally, Gillespie stressed that the 45–minute audio tape recording the State played to the jury amply exposed them to Schlager's level of remorse, and the unintentional nature of the attack, without exposing him to a potentially damaging cross-examination. *Id.* at 990, 995. Also, since Gillespie was successful in moving the court to include jury instructions on the lesser included offenses (simple battery and simple assault), he opined that the best option would be to hold the State to its burden of proof beyond a reasonable doubt. *Id.* at 1003–05.

### D. Procedural History

After the post-conviction hearing, Judge Tonigan denied Schlager's motions. Schlag-er was then sentenced to 13 years incarceration. On appeal, Schlager raised two issues: (1) that the evidence was insufficient to support a conviction; and (2) that he received ineffective assistance of counsel. On August 2, 1993, the Illinois Appellate Court rejected each of Schlager's claims and affirmed the conviction and sentence. *Schlager,* 187 Ill. Dec. 554, 617 N.E.2d 1275. Thereafter, Schlager sought leave to appeal in the Illinois Supreme Court. The Court denied his request on October 6, 1993. *People v. Schlager,* 152 Ill.2d 575, 190 Ill.Dec. 906, 622 N.E.2d 1223 (1993).

On July 19, 1994, Schlager filed the instant Petition raising the same ineffective assistance of counsel claim raised before the Illinois Appellate Court, namely, that his trial counsel (1) failed to pursue a confusional sleep disorder defense; and (2) failed to fulfill promises made to the jury in his opening statement. Mem. Supp. Petition ("Mem.") at 9, 12; Reply Mem. ("Reply") at 9, 13.

First, Schlager contends that the unfulfilled promises in Gillespie's opening statement led "inexorably to prejudicial error" because neither Dr. Ehrenpreis nor he testified. Mem. at 11. In his second claim, Schlager contends that Gillespie was ineffective because he did not pursue a confusional arousal defense. *Id.* at 12. Specifically, he alleges that he suffered constitutional and prejudicial error when Gillespie chose not to offer testimony of expert witnesses that allegedly would have supported his theory that he lacked the specific intent to commit attempted murder due to his use of Calan S.R. *Id.* at 12–15.

The State argues, on the other hand, that Schlager's claims fail to meet the stringent requirements for a successful ineffective assistance of counsel claim as set forth by the United States Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *See* Answer at 4. The State insists that Schlager fails both prongs of the *Strickland* test. This Court will now address Schlager's arguments in turn.

## DISCUSSION

### A. Standard of Review

 The United States Supreme Court established a two-prong standard that a defendant must satisfy for an ineffective assistance of counsel claim in *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. First, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688, 104 S.Ct. at 2064. This requires a showing "that counsel made errors so serious that counsel was not functioning as 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687, 104 S.Ct. at 2064. Second, a defendant must show that he or she was prejudiced by counsel's deficient performance. *Id.* To meet this showing, the defendant must establish that there exists "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068. Specifically, a petitioner must prove "that the deficient performance prejudiced the defense" such that it "deprive[d] the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687, 104 S.Ct. at 2064. *See also Banks v. Hanks*, 41 F.3d 1187 (7th Cir.1994) ("Deficient advice does not establish constitutionally ineffective assistance of counsel, ... [t]he prisoner must show that the errors prejudiced him."). Significantly, "[u]nless a defendant makes both showings, it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064.

 The Seventh Circuit has repeatedly stated that habeas petitioners raising ineffective assistance of counsel claims must clear a "high hurdle." *Griffin v. Camp*, 40 F.3d 170, 173 (7th Cir.1994); *see also United States ex rel. McCall v. O'Grady*, 908 F.2d 170, 173

(7th Cir.1990); *Sullivan v. Fairman*, 819 F.2d 1382, 1391 (7th Cir.1987). " 'Indeed, we expect that few petitioners will be able to pass through the "eye of the needle" created by *Strickland*.' " *Griffin*, 40 F.3d at 173 (quoting *Sullivan*, 819 F.2d at 1391, quoting Matthew 19:24). Because counsel is presumed effective, habeas corpus petitioners face an uphill battle in establishing a successful ineffective assistance of counsel challenge. *United States v. Jimenez*, 992 F.2d 131, 134 (7th Cir.1993).[6]

Furthermore, the Seventh Circuit recently and unequivocally set forth its position on habeas corpus petitions in *Tyson v. Trigg*, 50 F.3d 436 (7th Cir.1995), wherein Chief Judge Posner speaking for the court stated:

> [The defendant] had appeal from his conviction. Federal habeas corpus does not entitle him to another. A federal court may intervene in the state criminal process, nullifying a defendant's conviction and sentence and forcing the state to try him anew (or else simply let him go), only if the state criminal proceeding was vitiated by an infringement of one or more of a limited subset of the defendant's federal rights. If required to substitute our judgment for that of the [state] court of appeals, we might come to a different conclusion from that court. But we are not authorized to conceive of our job in that way. We are not to offer a further tier of appellate review. We are to determine only whether [the defendant] was deprived of any of his federal rights that can be enforced in a federal habeas corpus proceeding.

*Id.* at 438.

Application of the standard set forth in *Strickland* and the principle expressed in *Tyson* to the undisputed facts of this case,

---

6. Since Schlager's claim stems from Gillespie's failure to bring evidence before the Court, this Court " 'cannot even begin to apply *Strickland*'s standards unless and until [Schlager] makes a specific, affirmative showing as to what the missing evidence or testimony would have been.' " *United States v. Lane*, 926 F.2d 694, 701 (7th Cir.1991) (quoting *United States ex rel. McCall v. O'Grady*, 908 F.2d 170, 173 (7th Cir.1990)), *cert. denied*, 502 U.S. 1116, 112 S.Ct. 1230, 117 L.Ed.2d 464 (1992). The focus of such an inquiry must be on what information would have been brought before the court, and whether such information, assuming admissibility, would have produced a different result. *Lane*, 926 F.2d at 701. Here, in view of the post-conviction hearing, this court finds that Schlager has met this burden; thus, we proceed to apply the *Strickland* standards.

mandates that this Court deny Schlager's Petition.

### B. Opening Statement Claim

■ This Court does not find, despite the very creative and eloquent argument of Schlager's present counsel to the contrary, that the unfulfilled promises made in a small portion of Mr. Gillespie's opening statement warrant an ineffective assistance of counsel finding under *Strickland.* After a thorough review of the 834 page post-conviction hearing, this Court finds sufficient justification for Gillespie's strategic decision to forego having Dr. Ehrenpreis and Schlager testify before the jury. As the trial progressed, it became painfully clear that testimony of Dr. Ehrenpreis and Schlager may no longer be a strategically sound decision. (R. 1003–06)

In particular, as Gillespie noted, the prosecution had an abundance of evidence to attack Schlager's credibility. *Id.* Also, Schlager's alleged use of Calan S.R. was "problematic because there was a gale of evidence out there he wasn't taking the drug at all." *Id.* at 1509.

Schlager contends that Gillespie's unfulfilled promises warrant a finding of ineffective assistance of counsel. Reply at 12. He cites to *Harris v. Reed,* 894 F.2d 871, 879 (7th Cir.1990), and *Anderson v. Butler,* 858 F.2d 16, 17–19 (1st Cir.1988), to bolster his claim. Reply at 12. Notwithstanding Schlager's engaging argument, this Court finds those cases distinguishable. In *Harris,* the defendant succeeded with his ineffective assistance of counsel claim after his defense counsel failed to call an eyewitness who saw another man run from the murder scene, as promised in the opening statement. *Harris,* 894 F.2d at 878. When the defense counsel informed the defendant of the decision not to call the eyewitness, he voiced his opposition and even requested that he be allowed to take the stand, but his defense counsel persuaded him not to do so. *Id.* In finding ineffective assistance, the *Harris* court stressed that the defense counsel did not offer a strategic justification for his failure to call the eyewitness; further, the defendant was so prejudiced by the action that, but for the unfulfilled promise and the missing testi-mony of the eyewitness, the result of the proceeding would have been different. *Id.* at 878–879.

The present matter stands in sharp contrast to *Harris.* Specifically, it is clear that Gillespie made a strategic decision, with significant input from Schlager, not to fulfill the promises made in opening statement. (R. 984, 988, 1025). Schlager was actively involved in all phases of the decision making process and he even had the final word as to whether he should testify, unlike the defendant in *Harris. Id.* Clearly, if Schlager were to testify, the State would be *eagerly* awaiting an opportunity cross-examine Schlager. Also, since Dr. Ehrenpreis' testimony was (1) limited by Judge Tonigan; (2) heavily dependant on Schlager's use of the Calan S.R., which would be rebutted by his own wife and daughter; and (3) based on the dubious, at best, nexus between the drug and sleep dysfunction, which the State was prepared to establish through its own expert (R. 1000, 1003), Gillespie decided not to call him.

In *Anderson,* the court held that the failure to produce an expert psychiatric witness to support a defense theory, as promised in opening statement, was prejudicial as a matter of law and constituted a *Strickland* violation. *Anderson,* 858 F.2d at 19. Again, however, the facts of *Anderson* are significantly different from those presented here. In *Anderson,* immediately after the State rested, the defense counsel made an opening statement in which he promised that he would provide expert testimony concerning a defense to the defendant's actions, but the following day the defense counsel rested without calling the expert witness. *Id.* at 18. In finding ineffective assistance of counsel, the court noted that the strategic decision not to call the witness, standing alone, presented no problem; however, the fact that the defense counsel made such a promise only the day before and then failed to offer the witness was a "speaking silence," which was prejudicial and inexcusable because the matter was given so little thought. *Id.*

The case at bar is distinguishable from *Anderson.* Specifically, Gillespie's unfulfilled promises were not of the *Anderson* "speaking silence" type. Here, the State put on its

entire case *after* Schlager's opening statement, thus affording Gillespie an opportunity to reevaluate the decision to put Dr. Ehrenpreis and Schlager on the stand, as well as diminishing the impact of the small portion of Gillespie's opening statement where the unfulfilled promises where mentioned.

Therefore, this Court finds that Gillespie's decisions were embedded in sound trial strategy. We will not function as a "Monday morning quarterback" and call the plays that we think Gillespie should have called. *See Harris,* 894 F.2d at 877. Indeed, considering the potential repercussions on cross-examination of Schlager's testimony and the limited scope of Dr. Ehrenpreis' testimony, this Court cannot conclude that Gillespie's decision fell below an objective standard of reasonableness; nor do we find that the outcome in this case would have been different had Gillespie honored the promise he made during his opening statement. *See Strickland,* 466 U.S. at 668, 694, 104 S.Ct. at 2052, 2068; *cf. Turner v. Williams,* 35 F.3d 872, 903 (4th Cir.1994) (failure to introduce mitigating evidence described in opening statement was not ineffective assistance of counsel), *cert. denied,* —— U.S. ——, 115 S.Ct. 1359, 131 L.Ed.2d 216 (1995). Furthermore, since Schlager gave Gillespie "reason to believe that pursuing certain investigations would be fruitless or even harmful," his decision not to pursue "those investigations may not later be challenged as unreasonable." *Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066. We now move to Schlager's next claim, which fails for many of the same reasons already set forth.

### C. Confusional Arousal Defense Claim

Based on the comprehensive record available in this case,[7] this Court finds that Schlager's ineffective assistance of counsel claim regarding Gillespie's decision not to pursue a "confusional arousal defense" fails both prongs of the *Strickland* standard. Specifically, Schlager fails to establish, which he must, that Gillespie's performance was deficient to the degree that it fell below the profession's objective legal standards for reasonable effective representation; also, Schlager fails to establish that this alleged deficiency prejudiced him to the degree that there would be "a reasonable probability that but for [Gillespie's alleged] unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068. *See Drake v. Clark,* 14 F.3d 351, 355–356 (7th Cir.1994); *Lane,* 926 F.2d at 700.

■ In the instant matter, Schlager contends that "[t]he linchpin of [his] § 2254 presentation is defense counsel's failure to even communicate with either doctor [Radulovacki or Cartwright] prior to or during [his] trial [about a confusional arousal defense]." Petition at 7 (emphasis omitted). In view of the post-conviction hearing testimony, this Court disagrees with Schlager's contention that this failure amounts to ineffective assistance of counsel. Although Gillespie did not communicate with either doctor, Dr. Ehrenpreis and Schlager communicated with both Drs. Radulovacki and Cartwright on several occasions. (R. 931, 936, 1049, 1064–65). In turn, Dr. Ehrenpreis and Schlager interacted continuously with Gillespie throughout the trial discussing the merits of Schlager's defense. *Id.* at 998–1003.

Apparently, Gillespie saw no need to communicate with Drs. Radulovacki and Cartwright, especially in view of the PDR's acknowledgement that there was no definite causal relationship between the use or withdrawal of Calan S.R. and vivid dreams or night terrors, and since their testimony would be limited in scope as Dr. Ehrenpreis' testimony would have been. And, if necessary, Dr. Ehrenpreis could have testified as to the alleged use of Calan S.R. and sleep disorders, as he did in the post-conviction hearing. Finally, as discussed earlier, there was an abundance of available evidence indicating that Schlager was not even taking the drug during the relevant time period. (R. 1003–06)

Nevertheless, Schlager now contends that because Gillespie was initially contemplating a possible insanity defense or defense based

---

7. This Court specifically commends Judge Tonigan for the diligent manner in which he conducted Schlager's state post-conviction hearing. This hearing obviated the need for a further development of the record in this case.

on sleep dysfunction and then abandoned such a defense during the State's case, he was rendered ineffective assistance of counsel. Reply at 1–5. Schlager cites *Montgomery v. Petersen*, 846 F.2d 407 (7th Cir.1988), and *United States ex rel. Cosey v. Wolff*, 727 F.2d 656 (7th Cir.1984), to support his argument.[8] Reply at 6, n. 7. However, those cases are readily distinguishable from the case at bar. In *Montgomery*, the court held that a defense counsel's failure to investigate the only available disinterested alibi witness to a residential burglary constituted ineffective assistance of counsel. *Montgomery*, 846 F.2d at 415. The court stressed that "the importance of the information [from the disinterested witness] that was not tracked down and presented to the jury is, under the facts of this case, extraordinarily significant." *Id.* at 413.

Here, the post-conviction hearing provided valuable insight into the questionable merits of Schlager's confusional arousal defense, which Gillespie alluded to on several occasions throughout the hearing. (R. 1000–01, 1003) Unlike *Montgomery*, where a disinterested witness could have exculpated the defendant by providing extraordinarily significant testimony; here, the potential expert witnesses' testimony was not only limited in scope by Judge Tonigan's order, but was also significantly tied to the credibility of Schlager, which was problematic at best. *Id.* at 1003–05. Thus, unlike *Montgomery*, it is very doubtful that the abandoned defense would have had any exculpatory effect.

In *Cosey*, where the defendant was convicted of attempted murder and other lesser included offenses, the court found that the defense counsel's "out-of-hand rejection of proffered witnesses without interviewing or investigating them" fell below the minimum level of competence. *Cosey*, 727 F.2d at 658–659. In concluding that a finding of ineffective assistance of counsel was warranted, the court emphasized that the defendant's entire defense rested on discrediting the State's main witness—the victim—and that the five proffered witnesses would not only have cor-

roborated the defendant's story, thereby impeaching the victim, but they also would have entirely exculpated the defendant. *Id.* at 658 n. 3. The defense counsel's decision to merely discredit the victim's testimony by pointing out inconsistencies, and exposing that he was a drug addict, failed to rise to the minimum standard of professional competence. *Id.* at 657–658.

In the instant matter, Gillespie did not make an out-of-hand or unreasoned rejection of the confusion arousal defense; rather, he had the opportunity to discuss its merits, at great length, with Dr. Ehrenpreis and Schlager who in turn discussed the trial with Drs. Radulovacki and Cartwright. Based on the State's case, Gillespie chose not to pursue the defense. (R. 1000–05) Gillespie alluded to his decision on several occasions throughout the hearing. *Id.* Again, in view of the limited scope of the expert witnesses' testimony and the potential credibility problems facing Schlager, Gillespie made a strategic decision, not a out-of-hand rejection, not to pursue a questionable defense.

Despite this Court's holding herein, there can be no doubt that in a perfect world Gillespie could have been a bit more reticent during his opening statement and also could have personally contacted witnesses Radulovacki and Cartwright to determine for himself if they were worthy of being used as witnesses. Certainly if this Court were grading Gillespie's performance as a trial attorney these potential discrepancies would be worth mentioning. However, that is not the Court's role here. Moreover, trial advocacy is art, and not an exact science, which unfortunately is too often times measured by the results of trials. Yet, any trial attorney worth his or her hourly rate has come to the realization that the outcome of a trial is most often determined by the facts of the case.

In this case, the facts were against Schlager. He was represented by a very competent, though not perfect, trial counsel. Although his trial was not perfect, and few are,

---

**8.** To the extent that *Cosey* divides the burden to prove both prongs of the *Strickland* standard "between the defendant and the government and requires the government to show lack of preju-

dice from defendant's counsel's deficient conduct, *Cosey* is inconsistent with *Strickland* and is therefore overruled." *United States v. Payne*, 741 F.2d 887, 891, n. 4. (7th Cir.1984).

his conviction certainly was not the product of any constitutional error. *See United States v. Lane,* 474 U.S. 438, 445, 106 S.Ct. 725, 729, 88 L.Ed.2d 814 (1986) (" 'given the myriad safeguards provided to assure a fair trial, and taking into account the reality of human fallibility of the participants, there can be no such thing as an error-free, perfect trial, and ... the Constitution does not guarantee such a trial.' ") (quoting *United States v. Hasting,* 461 U.S. 499, 508–09, 103 S.Ct. 1974, 1980, 76 L.Ed.2d 96 (1983)). As an initial matter, Schlager must first show that Gillespie's actions fell below the objective reasonable standards as described in *Strickland.* They did not. Rather, Gillespie based his actions on sound trial strategy in view of the facts developed by the State. (R. 1000– 05) However, assuming, *arguendo,* that Schlager could establish the first *Strickland* prong, he still must establish that there existed "a reasonable probability that, but for [Gillespie's] unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068; *see also McAleese v. Mazurkiewicz,* 1 F.3d 159, 167 (3d Cir.) (decision not to call an alleged alibi witness was a strategic decision and not ineffective assistance of counsel), *cert. denied,* —— U.S. ——, 114 S.Ct. 645, 126 L.Ed.2d 603 (1993). Here again, this Court finds that Schlager has not done so. The potential expert testimony would have been limited in scope-thereby diminishing its import—and readily rebutted by the State's expert (R. 1003); more importantly, the potential testimony that would have been conveyed to the jury by the experts would have be based heavily on Schlager testifying, which he chose not to do.

As was the case in *Tyson,* Schlager had his "one appeal from his conviction. Federal habeas corpus does not entitle him to another." *See Tyson,* 50 F.3d at 438. "We are not authorized to offer a further tier of appellate review. We are to determine only whether [Schlager] was deprived of any of his federal rights that can be enforced in a federal habeas corpus proceeding." *Id.* Schlager was not deprived of his Sixth Amendment rights.

## CONCLUSION

For all of the foregoing reasons, the Petition for a Writ of Habeas Corpus is denied. The Clerk of the Court is directed to dismiss petitioner Seymore Schlager's Petition for a Writ of Habeas Corpus with prejudice. This order shall constitute a final order for purposes of Fed.R.Civ.P. 58. This case is terminated.