IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 9, 2005

## STATE OF TENNESSEE v. KERVIN MERCEL COLLINS

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2003-B-1536  Mark J. Fishburn, Judge**

---

**No. M2004-01995-CCA-R3-CD - Filed January 31, 2006**

---

The defendant, Kervin Collins, was involved in an altercation with his father, the victim. The defendant hit the victim several times with a shovel. After an indictment for aggravated assault, a Davidson County jury found the defendant guilty as charged. The trial court sentenced the defendant to five years as a Range I standard offender, and the defendant appealed. We reverse the judgment of the trial court with regard to the denial of the defendant's motion for mistrial and remand for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court Reversed and Remanded.**

JERRY L. SMITH, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., J., joined; DAVID G. HAYES, J, filed a dissenting opinion.

F. Michie Gibson, Jr., Nashville, Tennessee, for the appellant, Kervin Mercel Collins.

Paul G. Summers, Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Victor S. Johnson, District Attorney General; and Kimberly Cooper, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The defendant lived with his father, the victim, intermittently from April of 1998 until May 3, 2003, the date of the assault. The defendant was unemployed and living with the victim at the time. On May 3, 2003, the victim offered to pay the defendant for mowing the grass. Around 9:00 a.m., the victim paid the defendant part of the money, $35.00. The defendant was worried that he would spend all the money, so he requested that the victim pay him part of the money. After receiving the money, the victim went to Nolensville Road. The defendant returned about an hour and a half later. It was obvious to the victim that the defendant had been drinking. The victim told

the defendant, "[I]f you come back any higher than you already are, then you can't get in the house." The defendant left and returned to Nolensville Road.

The defendant returned about an hour later. The victim decided that the defendant had gotten too drunk to come in the house. The defendant got to the front porch of the house. The victim opened the front door and told the defendant that he could not come in the house. The defendant went around to the back of the house where the garage was located. There was a door from the garage to the house. The garage door was closed, but a bottom panel of the door was rotted. The victim was concerned that the defendant could slide underneath the rotted panel and gain entry to the house.

The victim went out to the garage. He got a broom to use to brace the garage door at the bottom. The defendant was able to push the broom handle aside and slide under the garage door. After the defendant got inside the garage, he began to hit the victim with his fists.

The victim tried to run away from the defendant. While he was attempting to escape the defendant, the victim grabbed a tire rim to use as a shield against the defendant. The defendant grabbed the tire rim and threw it aside. The defendant picked up a shovel and began to hit the victim. The defendant hit the victim on the arm, which prompted the victim to state, "You hit me on my arm, I believe it's broke." The defendant did not reply and continued to hit the victim with the shovel. The victim opened the garage door with the garage door opener and ran outside into the backyard.

Once outside the victim began to yell for help. The defendant continued to hit the victim with the shovel. The victim called to his neighbor, Mr. Heaton. Heaton came, and the defendant asked him to call the police. When the defendant realized that the victim had asked Heaton to call the police, the defendant stopped hitting the victim. The defendant then ran into the garage to put on his shoes. The defendant came up to the victim, hit him in the head with a shoe and demanded the rest of his money for mowing the lawn. The defendant then ran away.

Because the police did not promptly arrive, the victim called 911. While on the telephone with the 911 operator, the victim heard the defendant break out two of the back windows of the house. The police arrived about that time. An ambulance took the victim to Vanderbilt Hospital. The victim stayed at the hospital for the evening. At the hospital, the staff stitched his cut, got the blood off of his face, gave him a CAT scan and x-rayed his arm. No internal injuries were found.

James Lonnie Heaton is the victim's next door neighbor. On May 3, 2003, Mr. Heaton was working in his garage and back yard. He heard a disturbance and heard someone say, "You broke my arm." Mr. Heaton then went to the fence between his yard and the victim's yard to see what the disturbance was. Mr. Heaton saw the victim and his son standing in the yard. The victim was frightened. The victim asked Heaton to call the police. Heaton immediately ran to his house to call 911. While Mr. Heaton was on the phone with the 911 dispatcher, he saw the defendant hit the victim with a shovel. Mr. Heaton went to the front of his house to flag down the police, who had

passed the location of the incident. Mr. Heaton told the officers that he had seen the defendant flee the scene.

Officer William Traughber with the Metropolitan Nashville Police Department responded to a "person with a weapon" call. On the way to the address provided by the 911 dispatcher, the officer was informed that the suspect was walking away from the scene. The officer saw the defendant walking down the street away from the scene of the incident. The dispatcher had given the officer a description of the defendant. The officer took the defendant into custody and placed him in the back of his police cruiser. The officer went to speak with the victim and Heaton. On the way back to the scene, the defendant became very loud, abusive and belligerent.

Dr. William Lummus is an emergency physician at Vanderbilt Hospital. Dr. Lummus treated the victim after the altercation with the defendant. The victim had a contusion on the left side of his forehead. The victim also had bruises on both of his forearms, a laceration on his left elbow, a hematoma on his lip and some blood from his nose. Dr. Lummus stated that the only treatment the victim received was stitches to the laceration on his elbow. The victim had three stitches underneath the skin and six stitches through the skin. The victim told the doctor that he was assaulted by his the defendant with a shovel. The injuries sustained by the victim were consistent with being struck with a blunt object. The victim also received pain medication.

On June 23, 2003, the Davidson County Grand Jury indicted the defendant for aggravated assault. A jury trial was held on May 24 and 25, 2004. The jury found the defendant guilty of aggravated assault. The trial court held a sentencing hearing on July 1, 2004 and sentenced the defendant to five years incarceration. After the denial of the defendant's motion for new trial, he filed a timely notice of appeal.

## ANALYSIS

The defendant argues three issues on appeal: (1) the evidence was insufficient to support his conviction; (2) the trial court erred in denying the defendant's motion for mistrial; and (3) the trial court erred in sentencing the defendant to five years incarceration.

### Mistrial

The series of events leading to the mistrial motion begins with the defendant's opening statement:

> Back on May 3rd of last year, [Defendant] was living with his father, that was his home also. He had mowed his father's yard that day. His father had paid him part of the money. And he came back, his father didn't want to let him in, didn't want to let him into his home. What the State has not told you today is, the proof will show that [Defendant] wasn't the original aggressor. [Defendant] came to his

-3-

home too, remember that, it's his home, and if [the victim] didn't want him there, there was legal ways to get him out. He didn't do that.

He came to his home, his father wouldn't let him in. The proof will show that in the back garage area there's a rotted out door, [Defendant] was crawling under that door, the garage door, to get in. And the proof will show that [the victim] was beating him with a broom handle. Now, I never asked any of you all if a broom handle was considered a dangerous weapon during the voir dire, maybe I should have, but it goes on the same principle, shovel, broom handle, anything that you can hit anybody with can hurt, it's a weapon; it doesn't have to be a gun or a knife.

The proof will then show that [Defendant] came in, that [the victim], his father, grabbed a shovel and started hitting him with a shovel. [Defendant] got that shovel away from him and protected himself. The proof will also show that [the victim], my client's father, attacked him with a wheel or a rim or something. And the only two questions or the questions you as a juror have to come down and decide at the end of this case was who was the original aggressor; and was my client acting in self-defense. And I submit that you will see that, one, there wouldn't have been an altercation if [the victim], my client's father, hadn't attacked him with a broom handle and a shovel; and two, any injuries that his father received was [sic] received in self-defense. If you believe, and I submit to you you will, that my client was acting in self-defense, you will find him not guilty of aggravated assault.

The next event leading up to the motion for mistrial occurred during the defendant's cross-examination of the victim. The defendant's counsel had begun questioning the victim regarding the altercation that began in the garage. The relevant portion is as follows:

Q.    Okay. So, he was coming in that garage and you were poking and hitting him with that broom; weren't you?

A.    No, I was not.

Q.    Well, do you remember testifying back last year on May the 8th, 2003, at the preliminary hearing?

A.    Yes, yes.

Q.    Okay. And do you remember a person named Richard Tennent that was representing your son?

A.    Yes.

Q. From the public defender's office?

A. Uh-huh (affirmative)

Q. And didn't you, under cross-examination, admit that you were hitting and poking your son?

A. No. If I did, that's not what I meant to say.

Q. Well, I don't know what you meant to say, but I'm going to tell you – I've got your transcript of your tape – or of your preliminary hearing here today, and I'm going to take you back to that now. All right?

A. Uh-huh (affirmative).

Q. I'm reading from page 8, line 37 through 40. And question to you, from Mr. Tennent: "Initially, when he was coming through, you jabbed the broom down there, did you, to hit him with it at that time?" And your answer was "Uh-huh." (affirmative).

A. And I believe that wasn't what I meant to say.

Q. Okay. And that was just five days after the incident; correct?

A. Yes.

Q. Okay. So, on that day, you were sworn on that day; correct?

A. Yes.

Q. Okay. And you were telling the truth; weren't you?

A. At the time, when maybe, I don't –

Q. That's "yes" or "no" answer. Were you telling the truth?

[State]: Your Honor, let the witness answer the question.

[The Court]: You can answer it with a "yes" or "no," then you'll have an opportunity to explain to answer.

By [the defendant's counsel]
A. Yes, I was telling the truth.

Q.      All right.  So on that day, on May the 8th, you were telling the truth when you testified that you were hitting and poking your son with the broom as he was coming under the door; correct?

[The State]: You Honor, if we may approach, please?

The Court: All right.

        (Whereupon, a bench conference was held.)

[The State]: Your Honor, I also have a transcript, and this was the one that we did a corrected transcript of, [Defendant's counsel] has a different transcript and the answer that he just said to the jabbed him with a broom when he came through the door, you hit him at that time, meaning this witness, he replies, "Uh-uh," negative. [Defendant's counsel] just read into the record, "Uh-huh," positive.

The trial court then realized that the defendant's counsel was working from an inaccurate transcript of the preliminary hearing.  At some point before trial, when the defendant was represented by another attorney, the parties had disputed the correctness of the preliminary hearing transcript.  A new corrected transcript was ordered.  The passage upon which the defendant's counsel at trial was relying upon for his cross-examination had been one of the passages that was corrected in the newer transcript.  After the trial court realized the mistake, the State requested that the defendant's attorney "read into the record that the victim did not just perjure himself."  The prosecution then argued the following as an alternative:

[T]he jury needs to be informed that the victim's testimony is consistent with what happened at the preliminary hearing and not inconsistent, especially since this is a case where the defense has argued that the defendant was not the first aggressor, that, what was just read into the record, completely turns that on its ear.

The defendant's counsel then asked for a mistrial.  He argued that the trial court should grant a mistrial because he had relied upon a faulty transcript in his opening statement to the jury.  The trial court denied the defendant's request and gave the following curative instruction to the jury:

Members of the jury, you have heard [Defendant's counsel] cross-examine [the victim] regarding possible inconsistent statements between his testimony in court today and his testimony as referenced in a transcript of the preliminary hearing on May 8th 2003.  [Defendant's counsel], who was not [Defendant's] original attorney, was provided, through no fault of his own, an inaccurate transcript of the preliminary

hearing; that transcript had been corrected, but these corrections were inadvertently not communicated to [Defendant's counsel] when he became attorney of record for [Defendant]. In light of the discrepancies in the transcripts, which [Defendant's counsel] was not aware, he is reserving cross-examination of [the victim] until tomorrow, since it apparently will affect the cross-examination by [Defendant's counsel]; therefore, you are to disregard the questions presented by [Defendant's counsel] on cross-examination and any answers provided by [the victim] to those questions.

The defendant argues on appeal that the trial court erred in not granting him a mistrial because his attorney made promises to the jury as to the defendant's self-defense claim, based upon the inaccurate transcript, and because he relied upon an inaccurate transcript his attorney broke his word and lost his credibility with the jury. The State argues that the defendant's counsel was able to elicit some testimony supporting his contention that the victim was the aggressor in a later cross-examination. The State argues that these statements were enough to salvage the credibility of the defendant's counsel.

The decision whether to grant a mistrial is within the discretion of the trial court and that decision will not be disturbed on appeal unless there was an abuse of discretion. State v. Reid, 91 S.W.3d 247, 279 (Tenn. 2002); State v. Smith, 871 S.W.2d 667, 672 (Tenn.1994). Moreover, the burden of establishing the necessity for a mistrial lies with the party seeking it. State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). "The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." Williams, 929 S.W.2d at 388. Generally, a mistrial will be declared and the jury discharged in a criminal case only if there is "manifest necessity" requiring such action by the trial judge. State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991) (quoting Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977)).

We conclude that there was a manifest necessity for a mistrial. For this Court to determine that the trial court erred in not granting a mistrial, the defendant must establish that there was a manifest necessity for declaring a mistrial. The defendant points us to two cases in the Federal courts where an attorney promised to call certain witnesses during opening statements, but did not actually present these witnesses during the trial. See Anderson v. Butler, 858 F.2d 16 (1st Cir. 1988); Harris v. Reed, 894 F.2d 871 (7th Cir. 1990). In both cases, the petitioners had brought a petition for habeas corpus and alleged ineffective assistance of counsel. The reviewing courts granted a new trial in both instances because they held that the attorneys were ineffective. Both courts included language in their opinions regarding the damaging effects of an attorney promising certain testimony, but not delivering it.

In Tennessee in the case of State v. Zimmerman, 823 S.W.2d 220 (Tenn. Crim. App. 1991); the defendant was charged with the second degree murder of her husband. In opening statement, the defendant's counsel promised to call a psychologist to testify regarding battered wife syndrome. At

the conclusion of the State's proof, trial counsel later recommended that the defendant not testify and did not call the promised psychologist. We determined that trial counsel was ineffective because there was no basis for the sudden change in trial strategy, and the defendant suffered prejudice in the sense that the failure to put on the promised evidence likely changed the result of the trial. Zimmerman, 823 S.W.2d at 226.

The issue in this case was not whether trial counsel was at fault; the trial judge found he was not. When trial counsel realized the mistake he immediately asked for a mistrial. However, the United States Supreme Court has noted that when counsel's performance is hampered by circumstances external to his own judgment, the Sixth Amendment's guarantee of a fair trial may nevertheless be implicated if because of the external constraints counsel is unable to subject the prosecution's case to true adversarial testing. See U.S. v. Cronic, 466 U.S. 648, 660, 104 S.Ct. 2039, 2047, 80 L.Ed.2d 657 (1984). If we conclude that it is prejudicial to a defendant when his attorney fails to put on promised evidence such as in Zimmerman, it follows that when an attorney is unable, through no fault of his own, to deliver such evidence, the attorney may not have performed deficiently, but the prejudice to the defendant is the same. The case against the defendant has not been subjected to the adversarial process envisioned by the Sixth Amendment. Id.

In Zimmerman, this Court stated the following:

> Moreover, the trial attorney should only inform the jury of the evidence that he is sure he can prove. . . . His failure to keep [a] promise [to the jury] impairs his personal credibility. The jury may view unsupported claims as an outright attempt at misrepresentation.

Zimmerman, 823 S.W.2d at 225 (quoting McCloskey, Criminal Law Desk Book, § 1506(3)(O) (Matthew Bender, 1990)).

In the defendant's case, although trial counsel promised a defense that he was sure he could deliver, the evidence on which he was relying was in the un-corrected transcript he had been given when he took over the defendant's case from previous counsel. Through no fault of his own, trial counsel relied upon this uncorrected transcript. Obviously, as we stated in Zimmerman, this mistake would have destroyed his personal credibility with the jury, such that the defendant would be unable

to reach an impartial verdict. Therefore, there was a manifest necessity in this case for the granting of a mistrial[1].

For the foregoing reason, we conclude that the trial court should have granted the defendant's motion for mistrial.

## Sufficiency of the Evidence

For instructive purposes, we also address the defendant's argument that the evidence was insufficient to support the jury's verdict of guilty. When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all conflicts in the testimony in favor of the state. State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994); State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. Id. The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. See Tenn. R. App. P. 13(e); Harris, 839 S.W.2d at 75. In making this decision, we are to accord the state "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." See Tuggle, 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. State v. Morgan, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." Matthews, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The defendant specifically argues that the evidence does not support his conviction because the State did not prove that the victim suffered serious bodily injury. Aggravated assault is found at Tennessee Code Annotated section 39-13-102(a). That statute states:

(a) A person commits aggravated assault who:
(1) Intentionally or knowingly commits an assault as defined in § 39-12-101 and:

---

[1] We are mindful of the fact that prior inconsistent statements such as the one involved here used to impeach a witness are typically inadmissible as proof of the substance of the statement because the prior statement does not fall under an exception to the hearsay rule. State v. Smith, 24 S.W.3d 274, 279 (Tenn. 2000). However, in the absence of an objection from the opposing party on a jury instruction limiting the jury's consideration of the prior statement to credibility issues, the prior statement may be considered as substantive evidence. Id. at 280. Had the transcript used to impeach the alleged victim in this case been accurate, we have no idea whether the jury would have been allowed to consider the victim's prior statements as substantive evidence or not.

(A) Causes serious bodily injury to another; *or*
(B) Uses or displays a deadly weapon . . . .

Tenn. Code Ann. § 39-13-102(a) (emphasis added). The defendant's indictment states that the defendant "intentionally or knowingly did cause bodily injury to [victim] by the use or display of a deadly weapon, to wit: **a shovel** . . . ." It is clear from the indictment that the State was relying on the fact that the defendant used a shovel during the assault as the factor that lifted the assault to an aggravated assault. The fact that the victim may not have suffered what would be considered "serious bodily injury" under the law in Tennessee is irrelevant.

The question is whether a shovel can be considered a deadly weapon. "'Deadly weapon' means: . . . [a]nything that in the manner of its use or intended use is capable of causing death or serious injury." Tenn. Code Ann. § 39-11-106(a)(5). We have held in two cases that a shovel can be considered a deadly weapon under this definition. See State v. Thomas J. Tackett, No. M1999-02541-CCA-R3-CD, 2001 WL 721852 at *10-11 (Tenn. Crim. App., at Nashville, June 28, 2001); State v. Douglas Canady, No. M1999-02135-CCA-R3-CD, 2000 WL 1449364, at *8-9 (Tenn. Crim. App., at Nashville, Sept. 29, 2000). In these cases, as in the present case, the defendants beat the victims with a shovel. We conclude that there is adequate evidence to support the conclusion that the defendant was using the shovel in a manner that was capable of causing death.

When viewing the evidence in favor of the State, we conclude that the evidence was more than sufficient to support the defendant's conviction for aggravated assault. For the foregoing reasons, this issue is without merit.

## Sentencing

As with the sufficiency issue, we also address the defendant's issue that his sentence of five years is more than necessary to punish the defendant and protect the public at large. "When reviewing sentencing issues . . . , the appellate court shall conduct a de novo review on the record of such issues. Such review shall be conducted with a presumption that the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d). "However, the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In conducting our review, we must consider the defendant's potential for rehabilitation, the trial and sentencing hearing evidence, the pre-sentence report, the sentencing principles, sentencing alternative arguments, the nature and character of the offense, the enhancing and mitigating factors, and the defendant's statements. Tenn. Code Ann. §§ 40-35-103(5), -210(b); Ashby, 823 S.W.2d at 169. We are to also recognize that the defendant bears "the burden of demonstrating that the sentence is improper." Ashby, 823 S.W.2d at 169.

In balancing these concerns, a trial court should start at the presumptive sentence, enhance the sentence within the range for existing enhancement factors, and then reduce the sentence within the range for existing mitigating factors. Tenn. Code Ann. § 40-35-210(e). No particular weight for each factor is prescribed by the statute. See State v. Santiago, 914 S.W.2d 116, 125 (Tenn. Crim. App. 1995). The weight given to each factor is left to the discretion of the trial court as long as it comports with the sentencing principles and purposes of our code and as long as its findings are supported by the record. Id.[2]

When sentencing the defendant, the trial court first applied the enhancement factors to the presumptive sentences. The trial court then announced that there were no applicable mitigating factors in the defendant's case. At the conclusion of the sentencing hearing, the trial court sentenced the defendant to five years as a Range I standard offender. The defendant argues that his sentence is excessive due to the trial court's application of enhancement factors found at Tennessee Code Annotated sections 40-25-114 (2) & (17). The trial court found that the following enhancement factors applied: "(2) The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; and (17) The crime was committed under circumstances under which the potential for bodily injury to a victim was great . . . ." Tenn. Code Ann. § 40-25-114 (2) & (17).

The State concedes that the trial court erred in its application of enhancement factors. The State concedes in its brief that enhancement factor 17, "the potential for bodily injury to a victim was great," should not have been applied to the defendant's sentence because it is an element of aggravated assault. This Court has previously held that "the presence of great potential for bodily injury is inherent in aggravated assault with a deadly weapon." State v. Hill, 885 S.W.2d 357, 363 (Tenn. Crim. App. 1994). Therefore, the trial court erred in applying this enhancement factor.

The question now becomes whether the one enhancement factor of the defendant having a history of criminal convictions or criminal behavior other than that necessary to establish the sentencing range is enough to support the defendant's sentence. The trial court sentenced the defendant to five years as a Range I standard offender.

The defendant was convicted of aggravated assault. Aggravated assault is a Class C felony in the defendant's case. Tenn. Code Ann. § 39-13-102(d)(1). The range of sentencing for a Range

_____

[2] We note that the Tennessee Supreme Court has determined that despite the ability of trial judges to set sentences above the presumptive sentence based on the finding of enhancement factors neither found by a jury or admitted by a defendant, Tennessee's sentencing structure does not violate the Sixth Amendment and does not conflict with the holdings of Blakely v. Washington, ___ U.S. ___, 124 S.Ct. 2531 (2004), United States v. Booker, __ U.S. ___, 125 S.Ct. 738 (2005), or United States v. FanFan, the case consolidated with Booker, because "the Reform Act [of Tennessee] authorizes a discretionary, non-mandatory sentencing procedure and requires trial judges to consider the principles of sentencing and to engage in a qualitative analysis of enhancement and mitigating factors . . . all of which serve to guide trial judges in exercising their discretion to select an appropriate sentence within the range set by the Legislature." State v. Gomez, 163 S.W.3d 632, 661 (Tenn. 2005).

I offender for a Class C felony is not less than three years, but no more than six years. Tenn. Code Ann. § 40-35-112(a)(3).

The State argues on appeal that the defendant's previous criminal history is sufficient to support the defendant's five-year sentence. The presentence report shows that the defendant has five prior convictions for assault, with the disposition of one of these unknown, one conviction for driving while under the influence, one conviction for public intoxication, and one conviction for disorderly conduct. We agree with the State that this criminal history is substantial enough to enhance the defendant's sentence by two years up to five years. In addition, the trial court found no mitigating factors. For this reason, we conclude that the defendant's sentence should be affirmed.

## <u>CONCLUSION</u>

For the foregoing reasons, we reverse the judgment of the trial court and remand for further proceedings in accordance with this opinion.

_____
JERRY L. SMITH, JUDGE